Gary MOORE, Appellant,

v.

Caroline F. MOORE, Appellee.

No. 05–10–00498–CV.

Court of Appeals of Texas,
Dallas.

July 3, 2012.

Rehearing Overruled Nov. 29, 2012.

Charles T. Frazier Jr., Alexander Dubose Jones & Townsend LLP, J.H. Amberson III, Amberson & Dunn, P.C., Dallas, TX, Susan S. Vance, Alexander Dubose & Townsend LLP, Austin, TX, for Appellant.

Katherine A. Kinser, Jonathan J. Bates, Kinser & Bates L.L.P., Michelle May O'Neil, O'Neil & Attorneys, Dallas, TX, for Appellee.

Before Justices O'NEILL, RICHTER, and FRANCIS.

## OPINION

Opinion by Justice O'NEILL.

Appellant Gary Moore appeals a final decree of divorce. In four issues, Gary complains the trial court erred in (1) failing to enforce a premarital agreement, (2) valuing the business entities of the community estate, (3) failing to make particularized findings as to the value of community assets, and (4) not conditioning the award of appellate attorneys' fees on success of the appeal. For the following reasons, we affirm the trial court's judgment.

Gary and Caroline F. Moore married on June 25, 2004. Gary filed for divorce about three years later. In his petition for divorce, he sought to enforce a premarital agreement. Caroline answered, filed a counter-petition for divorce, and alleged numerous grounds for invalidating the premarital agreement, including involuntary execution. The trial court bifurcated the proceedings to first determine enforceability of the premarital agreement. Following a two-day trial, the trial court found the agreement was not voluntarily signed and

concluded it was unenforceable. A trial on the division of property followed, after which the trial court valued seven business entities owned by the community at $2,798,246.06. The trial court awarded Caroline $1,399,123.03 as her community interest in those entities. Husband appeals.

Because Gary challenges the sufficiency of the evidence to support the trial court's determination that Caroline did not sign the premarital agreement voluntarily, we will first review the evidence presented concerning the events that led to and surrounded the execution of the agreement. Caroline and Gary became engaged in April of 2008 and married about two months later on June 25, 2008 while on a trip to Martha's Vineyard. When they first met, Gary told Caroline he was having financial problems and he had been "digging himself out of a hole" for several years. After they were engaged, Gary asked Caroline how she felt about a "pren-up." Gary told Caroline he wanted a premarital agreement to protect Caroline from "loans, liens, and lawsuits."

Caroline testified she did not oppose having a premarital agreement, and they began discussing terms of an agreement in May. Gary told Caroline that he was going to have his long-time business lawyer, Marty Barenblat, prepare the agreement and that it would be a "collaborative process" between Gary, Caroline, and Barenblat. Caroline spoke to Barenblat about the agreement, but he never told her he had a conflict of interest.

After Gary realized the premarital agreement could be subject to attack if Caroline did not have her own lawyer, he suggested she hire an attorney at his expense. Initially, Caroline suggested two family law attorneys, but Gary told her both were too expensive. Barenblat and Gary then suggested Caroline hire Mickey Hunt, an attorney that offices in the same building as Barenblat.

On June 16, nine days before the wedding, Caroline met with Hunt for the first time. Hunt reviewed the premarital agreement that Barenblat had drafted. The agreement he reviewed contained blanks where the value of Gary's property would be provided. The agreement also referenced schedules to be attached, but no such schedules were yet attached. Hunt told Caroline she needed to get the values and the schedules, otherwise, she would have no way of knowing what rights she was giving up. After a one-hour meeting, Caroline left Hunt's office with the understanding that Hunt and Barenblat would make changes to the agreement that satisfied his concerns.

The next day, Hunt met with Barenblat to inform him of the changes he wanted. Barenblat told him he would have to get back to him, but he never did. Instead of making the requested changes, Barenblat removed all reference to any values in the agreements and added schedules that did not include values.

On June 18, Caroline was preparing for the trip to Martha's Vineyard. She had planned to pick up the agreement from Barenblat that day so she could take it with her to Gary's home in Big Spring, Texas the following day. They were going to spend one night in Big Spring and then go to Martha's Vineyard. She called Barenblat that morning to see if the agreement was ready. He told her he was still making revisions that her attorney had requested. Caroline called again at about 6 p.m. Barenblat told her the document was complete and that her attorney had approved it and said it was okay for her to sign it. Barenblat told her she could not pick up the agreement because he had already sent it to Big Spring.

The following day, June 19th, Caroline drove to Big Spring. When she got there, she asked Gary if he had received the agreement. Gary told her he had not received it, but that it was going to be sent to Martha's Vineyard. The following day, Gary and Caroline flew to Martha's Vineyard. Caroline testified that in the four days leading up to their wedding, Gary went to the reception desk periodically to see whether any documents had arrived, but nothing had. Caroline assumed he was looking for the premarital agreement.

Four to five hours before the wedding, Gary produced the final draft of the premarital agreement that Barenblat prepared. Caroline had assumed the agreement had just arrived in Martha's Vineyard, but she later discovered Gary had received the agreement in Big Spring and it was in his suit case the entire time. The agreement was a completely new clean copy with nothing to show what changes had been made. Caroline thought the reason the agreement looked different was because of changes that her attorney had requested. Caroline did notice that the schedules of Gary's assets were now attached and did not contain values. She had assumed her attorney had determined this was acceptable. Gary also presented to her a waiver of disclosure. Caroline panicked because she did not understand the documents and tried to call Hunt, but she was unable to reach him. Gary then called Barenblat. Gary told Caroline that Hunt had approved the document and said it was okay for her to sign. Gary and Caroline executed the agreement and initialed each page. Caroline said she would not have executed the document if she had not been told her lawyer had approved it. Caroline and Gary married a few hours later.

Caroline later discovered that Hunt never reviewed the changes that were made, never reviewed the final draft, and never told Barenblat that it was okay for her to sign. Indeed, Hunt testified at the hearing that he would not have even given Barenblat permission to speak to his client about the agreement.

At trial, Gary denied hiding the agreement and denied that Caroline tried to call Hunt on their wedding day. Barenblat testified and claimed that Hunt both approved the agreement and told him he could tell Caroline she could sign the agreement.

■ After hearing the evidence, the trial court found Caroline did not sign the agreement voluntarily and refused to enforce it. In his first issue, Gary contends the evidence is legally and factually insufficient to support the trial court's involuntariness finding. Gary and Caroline agree voluntariness is a fact finding, but disagree as to the proper standard of review. Gary contends it is an ordinary sufficiency of the evidence standard of review while Caroline argues the proper standard is abuse of discretion.

The Texas Family Code grants trial judges vast power and broad discretion over many important matters. *See Tucker v. Thomas,* —— S.W.3d ——, ——, 2011 WL 6644710 (Tex.App.-Houston [14th Dist.] 2011, no pet.). When the Legislature seeks to limit or restrict a family court's discretion, it generally says so. *Id.* Thus, we generally construe the family law as vesting the trial court with discretion, unless the legislature has said otherwise. *See id.*

Texas has adopted the Uniform Premarital Agreement Act. Under that Act, premarital agreements are presumptively binding and enforceable under Texas law. *See* TEX. FAM.CODE ANN. § 4.002 (West 2006). However, the Act also provides

that a premarital agreement is not enforceable if the party against whom enforcement is requested proves that he or she did not sign the agreement voluntarily. *See* TEX. FAM.CODE ANN. § 4.006(a)(1) (West 2006). Given the express language of the Act, we conclude a trial court does not have discretion to invalidate a premarital agreement in the absence of legally and factually sufficient evidence of involuntariness.[1] Therefore, we will consider Gary's challenge to the involuntariness finding under the legal and factual sufficiency standards of review.

■■■ In an appeal from a bench trial, a trial court's findings have the same force and dignity as a jury's verdict upon questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991). A trial court's findings may be reviewed for legal and factual sufficiency under the same standards that are applied in reviewing evidence to support a jury's answers. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). The test for legal sufficiency is whether the evidence would allow reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005); *State v. State Street Bank & Trust Co.*, 359 S.W.3d 375, 377–78 (Tex.App.-Dallas 2012, no pet.). We may sustain a no-evidence point only if the record reveals the complete absence of a vital fact, the evidence conclusively proves the opposite of a vital fact, or if the only evidence of a vital fact is barred from consideration or is no more than a scintilla. *State Street*, 359 S.W.3d

at 378. When reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *State Street*, 359 S.W.3d at 378. We may set aside a finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

■■■ The Uniform Premarital Agreement Act does not define voluntariness and there are relatively few Texas cases discussing the meaning of the term as used in the Act. Texas courts have construed "voluntarily" to mean an action that is taken intentionally or by the free exercise of one's will. *Martin v. Martin*, 287 S.W.3d 260, 263 (Tex.App.-Dallas 2009, pet. denied). The parameters of involuntary execution of a premarital agreement may not be clear in every case and will tend to depend on the circumstances. *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 698 (Tex.App.-Austin 2005, pet. denied). In determining whether any evidence of involuntariness existed, this Court has considered (1) whether a party has had the advice of counsel, (2) misrepresentations made in procuring the agreement, (3) the amount of information provided and (4) whether information has been withheld. *See Martin*, 287 S.W.3d at 264–66. Evidence of fraud and duress may also provide proof of involuntariness. *Sheshunoff*, 172 S.W.3d at 697–98. However, fraud and duress are not themselves defenses to a premarital agreement. *See id.*

1. Often, the determinations a trial court makes in family law cases, such as property division incident to divorce, or conservatorship, visitation, and child support, do not turn on one discrete factual issue. Rather, the trial court must exercise its sound discretion based on various underlying factual findings. In such cases, setting aside a finding for insufficiency does not automatically require setting aside the trial court's ultimate determination. For example, it is possible to set aside factual findings on property valuation, but doing so would not automatically show the overall division of a marital estate was an abuse of discretion. *See Jurek v. Couch-Jurek*, 296 S.W.3d 864, 873 (Tex.App.-El Paso 2009, no pet.).

At trial, Caroline presented evidence that before she married Gary, he misrepresented his financial condition and claimed he wanted her to sign a premarital agreement to protect her from "loans, liens, and lawsuits." Gary first attempted to use his own lawyer to assist them to write the agreement in a "collaborative effort." When he realized this could subject the agreement to attack, he suggested she retain a lawyer at his expense. Gary, however, rejected the lawyers Caroline requested and directed her to a lawyer of his own choice. He then made it effectively impossible for Caroline's lawyer to review the final draft by misrepresenting to her that he did not have the agreement when they went to Martha's Vineyard and then hiding the agreement for several days until just hours before their wedding. The draft Caroline was presented at that time was the first version of the document that did not contemplate a value of Gary's estate being provided. The document also required her to verify Gary had given her full disclosure of the nature, extent, and value of his assets. Gary also requested Caroline to sign a document waiving further disclosure. Caroline panicked, tried to call her lawyer, and could not reach him. Gary then told Caroline that Hunt had approved the agreement and told her it was okay for her to sign. Caroline testified she was concerned but signed because of Gary's assurances and would not have done so but for such assurances. The trial court could find based on this evidence that Caroline did not sign the agreement voluntarily.

Gary directs us to some evidence that is contrary to the trial court's finding, including evidence that Caroline did not have to marry Garry that day, that she was willing to sign a premarital agreement, and that she read the agreement and could see for herself that it did not include information about Gary's assets. Giving this evidence due consideration, we cannot conclude it is so compelling or overwhelming as to negate or override the trial court's involuntariness finding.

Furthermore, we reject Gary's additional arguments. First, Gary asserts Caroline was required to prove "an express direct threat or coercion" to establish involuntariness. Gary relies on cases showing what evidence courts have held did constitute evidence of involuntariness in post-nuptial cases. *Martin*, 287 S.W.3d at 265–66; *Izzo v. Izzo*, 03–09–00395–CV, 2010 WL 1930179, at *3, 10–12 (Tex.App.-Austin May 14, 2010, pet. denied) (mem. op.); *Myers v. Myers*, No. 03–05–00231–CV, 2006 WL 3523792, at *2 (Tex.App.-Austin Dec. 8, 2006, no pet.). These cases do not purport to limit the kinds of evidence that might show involuntariness. Rather, each case depends upon its own facts and circumstances.

Gary next contends recitations in the agreement prevent Caroline from proving involuntariness. The agreement recited that Caroline's attorney reviewed the agreement, that Caroline read and understood the agreement, and Caroline was signing the agreement voluntarily. According to Gary, we are required to presume the recitations in the agreement were true even though the evidence showed the recitations were false.

■ Unless prevented by trick or artifice, one who signs a contract "must be held to have known what words were used in the contract and to have know their meaning, and he must also be held to have known and fully comprehend the legal effect of the contract." *Nguyen Ngoc Giao v. Smith & Lamm, P.C.*, 714 S.W.2d 144, 146 (Tex.App.-Houston [14th Dist.] 1986, no pet.). As an initial matter, we conclude there was evidence of artifice that prevented Caroline from getting legal advice

about the final draft of the agreement. Moreover, Gary relies on ordinary breach of contract cases and waiver of reliance provisions in fraudulent inducement cases. The family code has expressly provided that a premarital agreement is not enforceable if it is not voluntarily signed. Gary cannot preclude Caroline from making this showing by including recitations in the very agreement that she alleges was not voluntarily signed.

Finally, Gary contends we cannot consider evidence that he and Barenblat both told Caroline that Hunt had reviewed and approved the agreement because Caroline's reliance on any representations by opposing counsel is not "justified." Gary's cases either clearly do not support his proposition or they are readily distinguishable. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 794–95 (Tex.1999) (discussing attorney's liability for negligent misrepresentation and noting attorney may be liable if he invites reliance on a known party for a known purpose); *Chapman Children's Trust v. Porter & Hedges, L.L.P.,* 32 S.W.3d 429, 443 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (discussing attorney's liability for negligent misrepresentation). Here, Caroline did not sue Barenblat and we are not determining Barenblat's liability. Moreover, the false statements Barenblat made did not concern any legal advice or legal claim or any fact that concerned a legal claim or position. Rather, the statement was a direct false factual representation that Caroline's attorney had reviewed and approved the agreement and told her she could sign it. Regardless, the question is not whether Caroline can prove each element of fraud or fraudulent inducement. Instead, considering evidence of fraud or fraudulent inducement, we look directly to the controlling question of whether the document was signed involuntarily. *See Sheshunoff,* 172 S.W.3d at

697 (fraud, duress, and undue influence may bear upon voluntariness question, but party claiming involuntary execution need not prove each element of these common law defenses); *Daniel v. Daniel,* 779 S.W.2d 110, 114 & n. 4 (Tex.App.-Houston [1st Dist.] 1989, no pet.) (observing that involuntary execution "alleviates the need for proof of all elements required in common law defenses" such that party need not prove knowledge or reliance as would be required to show fraud). Having reviewed all the evidence in the light most favorable to Caroline, we conclude the there is legally and factually sufficient evidence to support the trial court's involuntariness finding. We resolve the first issue against Gary.

■ Gary's remaining issues concern division of the community estate and, in particular, the trial court's valuation of certain business entities. At trial, the evidence showed the community had an interest in seven entities that operate movie theaters, Orlando Premiere Cinema, L.L.C., El Paso Premiere Cinema, L.P., Galveston Island Cinema L.L.C., Café Bistro, Eastern Shore Premiere Cinema, L.L.C., Tannehill Premier, L.L.C., and Burleson Premier Cinema, LLC.

Gary presented the testimony of valuation expert Jim Penn. Penn, using an income approach, valued the community's interest in five of the entities to be $1, and the remaining two to be $358,000. In making his valuation, Penn predicted future income based on past revenues and various contracts that the entities had entered into, including a management fee contract in which the entities paid a management fee to Gary's separate property company, Premiere Cinema Corporation (PCC). Some of these contracts required the community property entities to pay all their profits to PCC.

Caroline's expert—Morris Schulman—also using an income approach, predicted income based on past revenue, but calculated costs based on industry standards. Schulman valued five of the entities at $13,437,407. Adjusting for the community's percentage interest in these entities would result in a value of $11,126.933. Following the close of evidence, the trial court sought additional valuation evidence. Specifically, the trial court directed Gary to reduce the management fee the entities pay to PCC to make it consistent with industry standards. The trial court then ordered the parties to recalculate the value of the entities based on the reduced fee. Penn's adjusted values were basically unchanged, but Schulman's recalculation reduced his valuation of the five entities to $8,063,647. Adjusting for the community's ownership interest in the entities would result under Schulman's recalculation in a value of $6,653,154. After hearing the evidence, the trial court did not accept either expert's valuation in full and valued the community's interest between the experts' opinions at $2,798,246.

Gary asserts the evidence is legally and factually insufficient to support the trial court's valuation. He contends Schulman's opinion was not reliable and therefore constitutes no evidence. He further asserts the trial court was required to accept Penn's valuation because it was the only "competent" evidence of fair market value. Caroline responds that Gary waived any complaint that Schulman's testimony was not reliable and the record as a whole supports the trial court's value determination.

 A trial court has broad discretion in determining a just and right division of the community estate. *Schlueter v. Schlueter,* 975 S.W.2d 584, 589 (Tex.1998). Under the abuse of discretion standard, lack of legally or factually sufficient evidence do not constitute independent grounds for asserting error, but are relevant factors in determining whether the trial court has abused its discretion. *Pickens v. Pickens,* 62 S.W.3d 212, 214 (Tex. App.-Dallas 2001, pet. denied). Generally, the value to be accorded community property in a divorce proceeding is "market value." *R.V.K. v. L.L.K,* 103 S.W.3d 612, 618 (Tex.App.-San Antonio 2003, no pet.); *see Beavers v. Beavers,* 675 S.W.2d 296, 299 (Tex.App.-Dallas 1984, no writ). While market value is usually the best evidence of the value of personal property, in the absence of a market value, the actual value of the property to the owner may be shown. *Beavers,* 675 S.W.2d at 299; *see also Mandell v. Mandell,* 310 S.W.3d 531, 537 (Tex.App.-Fort Worth 2010, pet. denied) (straight fair market value not always appropriate valuation method when community owns shares in closely held corporation, and any shares of stock is restricted).

 Generally, to preserve a complaint that an expert's testimony is unreliable, a party must object to the testimony before trial or when it is offered. *Guadalupe–Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 807 (Tex.2002); *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998). In particular, a party must object to complain that the expert's underlying methodology, technique, or foundational data is not reliable. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232–33 (Tex.2004). A timely objection is required to give the trial court an opportunity to analyze the underlying basis of the opinion and to allow the offering party the opportunity to cure any defect that may exist. *Ellis,* 971 S.W.2d at 409 (objection required to give proponent of evidence opportunity to cure defect); *Coastal,* 136 S.W.3d at 233 (objection required to allow trial court opportu-

nity to analyze underlying methodology, technique, or foundational data.). Thus, as a general rule, when a expert opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex.2009). However, an exception exists if the expert either provides no basis for his opinion or if the basis offered does not support the expert's opinion. *Id.* In such cases, the testimony is a mere conclusion and constitutes no evidence. *Id.*

Here, Schulman did provide a factual basis for his opinion. In particular, Schulman testified that the data he used was based on his knowledge of the industry, his personal knowledge of Gary's businesses, his review of the books and records of the entities, and his personal knowledge of the particular theaters at issue. Schulman testified he was basing his revenue projections on actual past revenues.[2] Further, Schulman conceded that he was valuing the entities by estimating costs according to industry standards, rather than the actual contracts that set such cost. Schulman explained he was providing his opinion as to the value of the entities in armslength transactions.

According to Gary, any valuation testimony had to be based on the actual expenses incurred. However, the evidence showed that most of the expenses to which Gary asserts had to be used to project income were owed to Gary's separate property company. These expenses could be manipulated at Gary's sole discretion and were not subject to ordinary market controls. We cannot agree with Gary's rationale, which would allow him to completely alter the value of any of the entities by changing the terms of these contracts at any given time.

Gary also suggests the facts on which Schulman relied did not support his opinion because Schulman did not consider certain debts in valuing the entities. Gary does not direct us to the evidence in the record to prove the debt he alleges. Further, most of the alleged debt was owed to Gary's separate property corporations. It is unclear how the amount of the debt was determined or how the debt was documented between the entities. In at least two instances, Penn admitted the debt he utilized to reduce the value of the community's interest was not recorded until two months before trial. Finally, even if Schulman did not account for the debt, Gary has established only that Schulman's value opinion should be reduced by the debt.[3]

Reviewing Gary's complaints, it is evident his complaint requires a review of the underlying methodology and foundational data that Schulman used in forming his opinion. In particular, Gary does not complain that Schulman did not express a

---

2. As evidence that Schulman did not rely on actual revenues, Gary asserts Schulman projected revenues for the Tannehill theater at $3 million, but actual revenues "for the months it operated in 2008" were just under $900,000. Obviously, an annual projection would be larger than revenues collected over a few months. To the extent Gary suggests projected revenues cannot include growth, his complaint is without merit. Even Gary's own expert utilized a growth rate.

3. In his brief, Gary contends Schulman "conceded at trial that applying the debt would bring his valuations of Orlando and Tannehill down to nearly zero and result in a negative value for El Paso." This is a mischaracterization of Schulman's testimony. Schulman never testified it would bring *his* valuations down to nearly or below zero. Rather, he testified that if he were to assume numerous facts (that he disputed he should assume) *then* applying the debt would bring the values down to nearly zero or below zero.

basis for his opinion—or that the basis that Schulman did offer was contradicted by the facts. Rather, relying on his own expert's testimony, Gary asserts Schulman should have used additional or different data. We conclude he was required to object to make this complaint. *See Graves v. Tomlinson*, 329 S.W.3d 128, 146 (Tex. App.-Houston [14th Dist.] 2010, pet. denied) (at bottom, Graves asks this Court to "evaluate the underlying methodology, technique, or foundational date used by the expert.").

In the alternative, Gary contends even if Schulman's testimony is "some evidence" there is no evidence of the "number chosen" by the trial court. However, when conflicting evidence of value exists, a trial court is permitted to assign a value within the range of evidence. *McIntyre v. McIntyre*, 722 S.W.2d 533, 536 (Tex.App.-San Antonio 1986, no writ). A trial court is also permitted to blend all the evidence to arrive at a value. *Id.*

Here, the trial court's valuation finding fell within the numbers offered by the expert testimony. The trial court could have properly concluded there were flaws in both expert's valuations and assumptions. Penn used actual revenues and modest growth rates, even though Gary testified the theaters were new and it usually took a few years for a theater to become profitable. Penn also used costs that could be manipulated in Gary's sole discretion, apparently without question. Schulman's testimony, on the other hand, did not account for the debt and projected revenues based on optimistic market conditions. However, the trial court's ultimate valuation was well below Schulman's opinion and was supportable by the evidence even considering the debt and giving "due allowance" for the factors presented by Gary. *See Morgan v. Morgan*, 657 S.W.2d 484, 490 (Tex.App.-Houston [1st Dist.] 1983, pet. dism'd). Viewing all the evidence, we conclude the trial court's value determination is supported by legally and factually sufficient evidence. We resolve the second issue against Gary.

In his third issue, Gary contends the trial court erred in failing to make particularized findings as to each of the entities involved. Section 6.711(a) of the family code provides that in a suit for dissolution of marriage, on request by a party, the court shall state in writing its findings of fact and conclusions of law concerning (1) the characterization of each party's assets, liabilities, claims, and offsets on which disputed evidence has been presented, and (2) the value or amount of the community estate's assets, liabilities, claims, and offsets on which disputed evidence has been presented. Tex. Fam.Code Ann. § 6.711(a) (West 2006).

Here, Gary requested findings under Texas Rule of Civil Procedure 296. Pursuant to that request, the trial court made findings with respect to the voluntariness of the premarital agreement and an aggregate value of the seven community property entities. The trial court did not assign a value to each entity separately. After the time to request findings expired, Gary requested the trial court to make "additional" and "amended" findings of fact. This motion—made after the time to request original findings—requested findings under section 6.711 of the family code for the first time. Gary asserts section 6.711 of the family code required the trial court to make findings as to each individual business entities on which there was disputed evidence. Caroline asserts Gary waived any error in the trial court's failure to make section 6.711 findings.

Gary does not contend the specific value findings were required under rule 296 itself and Gary's request for findings under section 6.711 was not timely. *See* Tex.

FAM.CODE ANN. § 6.711(b) (West 2006) ("A request for findings of fact under this section must conform to the Texas Rules of Civil Procedure.") We conclude Gary waived his right to section 6.711 findings. *Cf. Beach v. Beach,* 05–05–01316–CV, 2007 WL 1765250, *8 (Tex.App.-Dallas June 20, 2007, no pet.) (appellant's request for findings under rule 296 did not preserve his right to findings under section 153.258 of the family code), *disapproved on other grounds, Iliff v. Iliff,* 339 S.W.3d 74 (Tex. 2011). We resolve the third issue against Gary. Because of our disposition of Gary's first three issues, we need not reach his final issue complaining of the unconditional award of appellate attorneys fees to Caroline.

We affirm the trial court's judgment.