**Affirmed and Memorandum Opinion filed September 17, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00908-CV

---

## IN THE INTEREST OF A.M.H. AND R.Q.D., CHILDREN

---

**On Appeal from the 310th District Court
Harris County, Texas
Trial Court Cause No. 2015-61005**

---

## M E M O R A N D U M　　O P I N I O N

Kathy appeals the trial court's final divorce decree. She contends the trial court committed reversible error when it (1) found the prenuptial agreement to be enforceable; (2) made its just and right division of the parties' estate; and (3) excluded expert testimony. We affirm.

### BACKGROUND

Kathy and Michael met through a website called VietSingle in late 2005; he was 35 years old and she was about 24 years old at the time. Michael lived in Houston and Kathy lived in Vietnam. They communicated via telephone regularly.

During their courtship, Michael told Kathy that he wanted his future wife to sign a prenuptial agreement to protect his assets. Michael and Kathy met for the first time in person when Michael traveled to Vietnam for Chinese New Year in 2007. After the visit, Michael and Kathy continued to talk to each other daily. One of the topics of conversation was Michael's requirement that Kathy sign a prenuptial agreement. In the summer of 2007, Michael traveled to Vietnam and he and Kathy had an engagement party. During this stay, Michael presented Kathy with a prenuptial agreement, which was drafted by Michael's attorney Joseph Bui. Kathy had the agreement translated into Vietnamese because she does not speak or read English. Kathy requested a change to the prenuptial agreement Michael presented to her, but no revision was made at the time.

After the engagement, Michael returned to the United States. Bui prepared an application for Kathy's K1 90-day fiancée visa, and she arrived in the United States in June 2008. In August 2008, Kathy told Michael she was pregnant with his child. Michael told Kathy that she still needed to sign the prenuptial agreement, and she understood Michael would not marry her unless she signed the agreement. According to Michael, one paragraph stating that "[f]uture earnings would remain separate" was deleted in the prenuptial agreement per Kathy's request on August 5, 2008.

As Kathy's 90-day visa was about to expire, Michael found an attorney who spoke Vietnamese in the phone book. He drove Kathy to attorney Trang-Dai Vu Hoang's office for a consultation, which lasted for one to two hours. Michael paid Hoang's $100 consultation fee, but he was not present during the consultation. After the consultation, Kathy and Michael signed the prenuptial agreement in Hoang's office on August 28, 2008.

Michael and Kathy got married on September 3, 2008. Bui helped Kathy with

2

the paperwork to change her immigration status from a fiancée visa to permanent residency. As part of the process, Michael executed an affidavit of support (Form I-864) as Kathy's sponsor. Kathy obtained her Green Card in 2010; she became a United States citizen a few years later. During the marriage, Kathy and Michael had two children born in 2009 and 2012, respectively.

Kathy filed her original petition for divorce in October 2015. Michael filed an answer and original counter-petition in November 2015. The parties entered into a mediated settlement agreement regarding child support and conservatorship on October 12, 2016. Kathy filed an amended petition in April 2017. A bench trial was held with regard to the enforceability of the parties' prenuptial agreement in May 2017. After the bench trial, the trial court found the prenuptial agreement was enforceable because it was unambiguous, not unconscionable, and Kathy voluntarily signed it. The trial court signed findings of fact and conclusions of law on May 17, 2017.

The trial court signed a final divorce decree on August 18, 2017, incorporating the parties' mediated settlement agreement and prenuptial agreement. Kathy filed a motion for new trial on September 15, 2017, which was overruled by operation of law. She filed a notice of appeal on November 16, 2017.

**ANALYSIS**

## I.     Enforceability of the Prenuptial Agreement

Kathy contends in her first issue that the trial court reversibly erred by finding the parties' prenuptial agreement is enforceable because the agreement is unconscionable, was involuntarily signed by Kathy, violates federal law, and violates the Texas Constitution.

Under Texas law, prenuptial agreements are generally binding and

enforceable. *Matter of Marriage of I.C. and Q.C.*, 551 S.W.3d 119, 124 (Tex. 2018); *Marsh v. Marsh*, 949 S.W.2d 734, 739 (Tex. App.—Houston [14th Dist.] 1997, no writ). Such agreements are presumptively valid and enforceable unless the party against whom enforcement is sought proves that (1) she did not sign the agreement voluntarily; or (2) the agreement is unconscionable and she did not receive proper disclosures. *Moore v. Moore*, 383 S.W.3d 190, 194-95 (Tex. App.—Dallas 2012, pet. denied); *Marsh*, 949 S.W.2d at 739; *see* Tex. Fam. Code Ann. § 4.006(a) (Vernon 2006); *Matter of Marriage of I.C. and Q.C.*, 551 S.W.3d at 124.

"Texas has a 'strong public policy favoring freedom of contract' that is 'firmly embedded in our jurisprudence.'" *Matter of Marriage of I.C. and Q.C.*, 551 S.W.3d at 124 (quoting *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)). The supreme court has repeatedly stated that "parties 'shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts.'" *Id.* Also, courts will "rarely find a contract unenforceable on public policy grounds" and "[p]remarital agreements are no exception." *Id.*

In an appeal from a bench trial, a trial court's fact findings have the same force and dignity as a jury's verdict upon jury questions, and we review the fact findings for legal and factual sufficiency of the evidence by the same standards used in reviewing the evidence supporting a jury's verdict. *Sorrell v. Estate of Carlton*, 504 S.W.3d 379, 382 (Tex. App.—Houston [14th Dist.] 2016), *aff'd*, 2019 WL 1967135 (Tex. May 3, 2019).

In a legal sufficiency review, we consider evidence in the light most favorable to the findings and indulge every reasonable inference that would support them. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). If the evidence allows only one inference, neither the factfinder nor the reviewing court may disregard that

evidence. *Id.* If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the factfinder must be allowed to do so. *Id.* at 822. Accordingly, the ultimate test for legal sufficiency always must focus on whether the evidence would enable a reasonable and fair-minded factfinder to reach the judgment under review. *Id.* at 827.

In reviewing factual sufficiency, we consider and weigh all the evidence; a judgment can be set aside only if the challenged findings are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Sorrell*, 504 S.W.3d at 382-83.

We review a trial court's conclusions of law *de novo*. *Busch v. Hudson & Keyse, LLC*, 312 S.W.3d 294, 299 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). If we determine the trial court made an erroneous conclusion of law, we will not reverse if the trial court rendered the proper judgment. *Busch*, 312 S.W.3d at 299; *see Marchand*, 83 S.W.3d at 794. We uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence. *Marchand*, 83 S.W.3d at 794; *Busch*, 312 S.W.3d at 299.

## A.    Unconscionability

We begin by addressing Kathy's contention that the prenuptial agreement is unconscionable and therefore unenforceable. In particular, she asserts the agreement is unconscionable because:

- Michael knew Kathy was pregnant with his child "when it was made clear that she either had to sign the Prenuptial Agreement or return to Vietnam."

- "Michael knew there was no way for Kathy to remain in the United

5

States unless he married her."

- "[F]orcing a mother to accept a likely future in which her child would seldom see his father should . . . be held as a basis for unconscionability. This is especially true when both the child and mother would be at risk of shame and humiliation" upon return to Vietnam.

- Requiring Kathy to sign the agreement "to avoid being forced to return to a third world country that is not a member of the Hague Convention" is unconscionable.

- Kathy did not have any real bargaining power because only one minor change was made to the agreement upon Kathy's request.

- "[P]aying some lawyer you find in the yellow pages $100.00 to tell your pregnant fiancee facing imminent deportation that she is 'giving up everything' the day [sic] the Prenuptial Agreement is merely window dressing" and does not mitigate the unconscionable manner in which the agreement was executed.

- Kathy's attorney only met for one to two hours with her.

- Kathy "was the more unsophisticated party," dropped out of school, did not speak English, and "had very little assets when the parties began dating."

- "Kathy did not want to return to Vietnam because she felt her unborn child could have a better life in Texas."

- Michael failed to disclose in the prenuptial agreement "the value of any [of] his rental properties, the mortgage indebtedness on the rental properties, the existence [sic] or amounts in any bank accounts, or the

6

value of his 401k."

- The agreement was one-sided.

Neither the Texas legislature nor Texas courts have precisely defined unconscionability in the context of prenuptial agreements. *Marsh*, 949 S.W.2d at 739. Rather, courts have addressed unconscionability claims on a case-by-case basis examining the entire atmosphere in which the agreement was made. *Id*. In that regard, this court has stated that, "'[i]n determining whether a contract is unconscionable or not, the court must look to the entire atmosphere in which the agreement was made, the alternatives, if any, which were available to the parties at the time of the making of the contract; the non-bargaining ability of one party; whether the contract is illegal or against public policy, and, whether the contract is oppressive or unreasonable.'" *Id*. at 740 (quoting *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex. Civ. App.—Texarkana 1975, no writ)).

In reviewing whether a prenuptial agreement is unconscionable, we have considered factors such as the maturity and age of the individuals, their business backgrounds, their educational levels, prior marriages, and other motivations. *Id*. at 741. But we also have acknowledged that "'a party who knowingly enters a lawful but improvident contract is not entitled to protection by the courts,'" and "'[i]n the absence of any mistake, fraud, or oppression, the courts, as such, are not interested in the wisdom or impolicy of contracts and agreements voluntarily entered into between parties compos mentis and sui juris.'" *Id*. at 740 (quoting *Wade*, 524 S.W.2d at 86).

At the time Kathy signed the prenuptial agreement, she had known about the agreement for more than a year. In fact, Kathy knew that a prenuptial agreement would be a condition for marriage even before Michael first visited her in Vietnam. Kathy testified that Michael told her "a few times" during their courtship he wanted

his future wife to sign a prenuptial agreement because he had been married before and had assets he wanted to protect. Kathy admitted that she and Michael again talked about signing a prenuptial agreement during and after Michael's first visit to Vietnam and during his second visit before their engagement party. Although the parties disagreed whether Michael gave Kathy a prenuptial agreement before or after their engagement, it is undisputed that Kathy had the agreement after the engagement. It is also undisputed that Kathy had the agreement translated into Vietnamese because she did not speak English. She requested one change to the agreement.

Kathy testified she and Michael talked on a daily basis after Michael returned home, and the prenuptial agreement was a common topic of conversation. A few weeks after Kathy obtained her fiancée visa and arrived in Houston in June 2008, Michael again requested Kathy sign the prenuptial agreement. A minor change was made to the original agreement in August 2008. By the time Kathy got pregnant and her 90-day visa was about to expire, Kathy had known about the specific terms of the prenuptial agreement for at least one year. Contrary to Kathy's contention, it was not "made clear" that she had to sign the agreement when she got pregnant and her visa was about to expire; instead, Kathy knew the prenuptial agreement was a condition for marriage long before she arrived in Houston and got pregnant. Also, the fact that the prenuptial agreement was signed shortly before the wedding does not make the agreement unconscionable. *Marsh*, 949 S.W.2d at 741.

Further, Kathy's unwillingness to return to Vietnam "because she felt her unborn child could have a better life in Texas" and her desire to avoid any potential "risk of shame and humiliation" does not make the agreement unconscionable. And returning to "a third world country that is not a member of the Hague Convention"[1]

---

[1] We express no opinion on the veracity of Kathy's assertion that Vietnam is "a third world

8

can be of no import when there is no evidence Kathy or her child would be in any danger in Vietnam.

Additionally, Kathy's contention that her meeting with attorney Hoang is "merely window dressing" is unpersuasive. Kathy consulted with Hoang for one to two hours alone and both Hoang and Kathy testified that Kathy understood the terms of the agreement, including a waiver of reimbursement. Kathy claims that "it would have been extremely unrealistic for the attorney to have performed any sort of independent due diligence (e.g. request values of the properties and their related indebtedness)". But there is no evidence that Kathy did not know what the value of Michael's properties was or that a valuation and amount of liabilities was necessary information. The record does not reveal what Hoang and Kathy discussed during the consultation; maybe Hoang wanted to ask Michael for more details about his assets but Kathy did not want any more information and told Hoang that she already knew the value of Michael's assets. Kathy does not complain she had insufficient time to consult with Hoang or that Hoang was incompetent in any way.

Moreover, Michael testified that he disclosed the value of his assets and the amount of any liabilities. Although Kathy claims in her brief that the agreement is unconscionable because Michael failed to disclose in the prenuptial agreement "the value of any [of] his rental properties, the mortgage indebtedness on the rental properties, the existence or amounts in any bank accounts, or the value of his 401k," this argument is without merit for two reasons.

First, Michael testified that he and Kathy discussed his assets already during their courtship. Michael testified he told Kathy how many rental properties he owned or co-owned with his mother and how many had outstanding loans.

---

country that is not a member of the Hague Convention."

9

According to Michael, Kathy would ask during their conversations "how many homes are paid for and how much still got loans on them." Michael also testified he disclosed all of his assets in the affidavit of support he sent to Kathy in Vietnam as part of the fiancée visa application. He testified: "In the Affidavit of Support, I have to fully disclose my bank account, my properties' value, and what I still owed on them. So, I mean, I disclosed my 401(k) on there." He stated he sent the affidavit and supporting documents to Kathy because she needed that information for her fiancée visa interview.[2]

Second, even if Michael had not disclosed his assets and financial obligations to Kathy, nondisclosure would not affect our analysis of unconscionability. "Because disclosure forms the second prong of the test to rebut the presumption of enforceability, lack of disclosure is material only if the premarital agreement is unconscionable." *Marsh*, 949 S.W.2d at 743; *see* Tex. Fam. Code Ann. § 4.006(a); *Fazakerly v. Fazakerly*, 996 S.W.2d 260, 265 (Tex. App.—Eastland 1999, pet. denied) ("The issue of unconscionability must be decided by the trial court as a matter of law before the disclosure questions are addressed.").

Kathy also claims the prenuptial agreement is unconscionable because she was "the more unsophisticated party" and had less bargaining power because Michael only made one minor change to the agreement. We disagree. Although Michael was older than Kathy and was married before, both Kathy and Michael were mature adults at the time they signed the prenuptial agreement. While Kathy did not speak English, she had the prenuptial agreement translated into her native language.

---

[2] Kathy complains the trial court did not allow her expert witness (immigration attorney Mary Khano Foteh) to testify that "the I-134 Affidavit of Support does not ask for this discrete information." However, Kathy could have introduced the documents relating to the fiancée visa application Michael sent to her to rebut his testimony if she thought he was dishonest. Or she could have disputed the veracity of Michael's asserted disclosures during her testimony; she did not.

Kathy had less formal education than Michael, but she was business savvy.

Kathy dropped out of high school after finishing tenth grade to support her family. She was the breadwinner; she worked in "sales marketing" in Vietnam and also owned and operated two different businesses (a print shop and a photo shop) for several years before meeting Michael. In one of the emails admitted at trial, Kathy discussed the prenuptial agreement with Michael and told him: "I don't have a lot of education; it's true. But I understand a lot more than what you'd give me credit for." Evidence also showed that Kathy understood "the real estate investing side in Vietnam as far as properties."

Finally, Kathy asserts the agreement is unconscionable because it is one-sided. But this court has found that, although a prenuptial agreement may be disproportionate, unfairness is not material to the enforceability of the agreement. *Marsh*, 949 S.W.2d at 741. The mere fact that a party made a hard bargain does not allow her relief from a freely and voluntarily assumed contract; parties may contract almost without limitation regarding their property. *Fazakerly*, 996 S.W.2d at 265. We also note that the record before us contains no evidence of mistake, fraud, or oppression.

Under the circumstances of this case, we cannot conclude the trial court erred in finding the prenuptial agreement is not unconscionable.

### B. Voluntariness

We next address Kathy's argument that the prenuptial agreement is unenforceable because she did not execute it voluntarily.

The Family Code does not provide a definition of "voluntarily." *Osorno v. Osorno*, 76 S.W.3d 509, 511 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *see* Tex. Fam. Code Ann. § 4.006. Texas courts have construed "voluntarily" to mean

an action that is taken intentionally or by the free exercise of one's will. *Matter of Marriage of Lehman*, No. 14-17-00042-CV, 2018 WL 3151172, at *2 (Tex. App.—Houston [14th Dist.] June 28, 2018, no pet.); *Moore*, 383 S.W.3d at 195. The parameters of involuntary execution of a prenuptial agreement may not be clear in every case and will tend to depend on the circumstances. *Matter of Marriage of Lehman*, 2018 WL 3151172, at *2; *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 698 (Tex. App.—Austin 2005, pet. denied).

In determining whether evidence of involuntariness existed, we have considered (1) whether a party has had the advice of counsel, (2) misrepresentations made in procuring the agreement, (3) the amount of information provided, and (4) whether information has been withheld. *Matter of Marriage of Lehman*, 2018 WL 3151172, at *2; *Moore*, 383 S.W.3d at 195. Evidence of fraud and duress may also provide proof of involuntariness. *Matter of Marriage of Lehman*, 2018 WL 3151172, at *2; *Moore*, 383 S.W.3d at 195. But fraud and duress are not themselves defenses to a prenuptial agreement. *Matter of Marriage of Lehman*, 2018 WL 3151172, at *2; *Moore*, 383 S.W.3d at 195.

Kathy contends she involuntarily signed the prenuptial agreement because her attorney did not have the same opportunity as Michael's attorney to study the prenuptial agreement, "analyze the rental properties, or review the immigration agreements."[3] We reject Kathy's argument. Hoang met with Kathy for one to two hours. There is no evidence in the record that Hoang had insufficient time or opportunity to review the prenuptial agreement or any other documents in order to give Kathy competent legal advice. There is no evidence regarding what Hoang and Kathy specifically discussed during the consultation and what information Kathy

---

[3] It is unclear what "immigration agreements" Kathy refers to.

12

provided to Hoang so Hoang could get an understanding of Michael's assets and Kathy's immigration status. Both Hoang and Kathy testified that Kathy understood the terms of the prenuptial agreement. According to Michael, Kathy told him after the consultation with Hoang that Hoang had told her she would not be "getting anything out of this" agreement. Moreover, Kathy does not assert she received incompetent legal advice from her attorney.

We equally reject Kathy's argument that she involuntarily signed the prenuptial agreement because the agreement contains "material misrepresentations as to whether it disclosed the value of the assets and related liabilities" and a "failure to disclose such information clearly constitutes a withholding of information." Although the prenuptial agreement does not disclose the value of Michael's assets or liabilities, Michael disclosed this information orally and in documents he sent Kathy as part of the fiancée visa application. As we already stated, Michael testified he discussed his assets and liabilities with Kathy during their courtship, including how many rental properties he owned or co-owned with his mother and how many had outstanding loans. He also testified he disclosed all of his assets in the affidavit of support he sent to Kathy in Vietnam as part of the fiancée visa application, including information about his bank account, the value of his rental properties and outstanding debts, and his 401(k).

Lastly, Kathy seems to argue she signed the prenuptial agreement involuntarily and under duress because she would have had to return to Vietnam unmarried and pregnant unless she signed the agreement. However, for duress to be a contract defense, it must consist of a threat to do something the threatening party has no legal right to do. *Osorno*, 76 S.W.3d at 511. Here, "aside from his moral duties," Michael had no legal duty to marry Kathy. *Id*. "His threat to do something he had the legal right to do is insufficient to invalidate the premarital agreement."

*Id*. Kathy "was faced with difficult choices, but we cannot find her decision to sign the agreement was involuntary." *Id*.

Therefore, we conclude the trial court did not err in finding Kathy executed the prenuptial agreement voluntarily.

## C.    Violation of Federal Law

We now turn to Kathy's argument that the prenuptial agreement is unenforceable because it violates federal law.  In that regard, Kathy contends the I-864 affidavit of support Michael executed after the parties got married so Kathy could change her legal status to permanent residency required Michael to use all of his assets to support her after marriage.  Kathy claims the obligation created by the affidavit of support conflicts with the prenuptial agreement in that the agreement "only obligated [Michael] to use community property and not any wealth related to the rental properties to support Kathy."  According to Kathy, Michael "attempt[ed] to delay or hinder the federal government's ability to collect any claim . . .  under the I-864" via the parties' prenuptial agreement, thereby violating federal immigration law and rendering the prenuptial agreement unenforceable.

United States immigration law provides a procedure for a resident of the United States to sponsor a noncitizen for immigration into the country.  *In re Marriage of Kamali and Alizadeh*, 356 S.W.3d 544, 545-46 (Tex. App.—Texarkana 2011, no pet.).  As a condition to granting immigration status, the government requires the sponsor to execute an affidavit of support called "Form I–864, Affidavit of Support" in which the sponsor promises to support the immigrant seeking admission to the United States at a level not less than 125% of the national poverty level.  *Id*. at 546. An affidavit of support creates a legally enforceable contract between the sponsor and both the United States Government and the sponsored immigrant.  *Id*.  The sponsor's obligation to support the immigrant continues until

14

one of the following circumstances occurs:  (1) either the immigrant or the sponsor dies, (2) the immigrant obtains citizenship, (3) the immigrant ceases to hold permanent residency status and leaves the United States, (4) the immigrant "[o]btains in a removal proceeding a new grant of adjustment of status as relief from removal", or (5) the immigrant "has worked 40 qualifying quarters of coverage as defined under title II of the Social Security Act or can be credited with such qualifying quarters."  8 U.S.C.A. § 1183a (West 2011); 8 C.F.R. 213a.2 (West 2011).

Here, the parties do not dispute that Kathy was a citizen at the time she filed for divorce.  There is also no evidence in this case that Michael failed to support Kathy at any time prior to the divorce so that neither Kathy nor the government have a claim against Michael arising under the affidavit of support.  Even if the prenuptial agreement conflicted with the affidavit of support or "required Kathy to unilaterally release all rights that she might have by reason of her marriage to Michael," as Kathy asserts, any obligation Michael had under the affidavit of support expired when Kathy became a citizen.  *See* 8 U.S.C.A. § 1183a; 8 C.F.R. 213a.2; *In re Marriage of Kamali and Alizadeh*, 356 S.W.3d at 546.

Considering Kathy was a citizen at the time of the divorce proceedings and there is no evidence of failure to support Kathy during the marriage, her argument that the prenuptial agreement violated federal law because it conflicted with the affidavit of support and hindered the government's ability to collect any claim under the affidavit is meritless.  Thus, we conclude the trial court did not err in finding the prenuptial agreement enforceable.

### D.     Violation of Texas Constitution

Kathy also contends the premarital agreement is unenforceable and should be set aside because it violates the Texas Constitution.  In that respect, Kathy seems to allege the premarital agreement was executed to defraud a creditor, who in this case

15

is the government. She states in her brief that she and "the federal government clearly had claims under the I-864. The Premarital Agreement was executed right before those claims became part of a binding contract that had always been contemplated as part of the Premarital Agreement. Therefore, this Honorable Court of Appeals should render judgment that the Premarital Agreement should be set aside as a violation of the Texas Constitution."

We note that Kathy failed to cite any authority in support of her contentions other than a citation to article 16, section 15 of the Texas Constitution and to the definitions of "creditor" and "claims" in the Texas Property Code. Kathy also failed to provide an adequate argument for her contentions. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). We also note that, contrary to Kathy's assertion, there is no evidence in the record that she or the government "clearly had claims under the I-864." Nor is there any evidence that Michael procured the premarital agreement to defraud the government as a creditor, as Kathy asserts.

We cannot conclude the premarital agreement is unenforceable because it violates the Texas Constitution. The trial court did not commit reversible error when it found the prenuptial agreement to be enforceable. Accordingly, we overrule Kathy's first issue.

## II.    Just and Right Division

Kathy argues in her second issue that the "trial court committed reversible error in making a just and right division of the parties' estate." More specifically, Kathy complains that, because the trial court erred in finding the parties' prenuptial agreement to be enforceable, it erred in the just and right division. However, we already have determined that the trial court did not err in finding the prenuptial

16

agreement to be enforceable. Therefore, we reject Kathy's argument.

Kathy also states in her brief that "regardless of whether the Premarital Agreement is allowed to remain in effect, this case should be remanded for a new trial on the property division." Kathy makes no argument with regard to this statement. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). She does not explain why the trial court's property division is improper and should be remanded when the prenuptial agreement is valid and enforceable and the trial court's property division incorporated the parties' prenuptial agreement. Nor does Kathy cite any authority in support of her statement. *See id*.

We overrule Kathy's second issue.

## III. Exclusion of Expert Testimony

Kathy argues in her third issue that the trial court committed reversible error when it excluded the testimony of her expert witness, immigration attorney Mary Khano Foteh.

We review a trial court's exclusion of expert testimony for abuse of discretion. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (per curiam). The decision to admit or exclude evidence lies within the sound discretion of the trial court. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam). A trial court exceeds its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 72 (Tex. App.—Houston [14th Dist.] 2016, no pet.). When reviewing matters committed to the trial court's discretion, a reviewing court may not substitute its own judgment for that of the trial

court. *Id.* at 73. Thus, the question is not whether this Court would have admitted the evidence. *Id.* Rather, an appellate court will uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling, even if that ground was not raised in the trial court. *Id.* Therefore, we examine all bases for the trial court's decision that are suggested by the record or urged by the parties. *Id.*

A party seeking to reverse a judgment based on evidentiary error must prove that the error probably resulted in the rendition of an improper judgment. *Id.* To determine whether evidentiary error probably resulted in the rendition of an improper judgment, an appellate court reviews the entire record. *Id.*

Kathy argues the trial court committed reversible error when it excluded Foteh's testimony at the beginning of trial (although indicating it "may reconsider" its ruling later), declined to wait for Foteh to testify at the end of the bench trial after Foteh was late returning from another court hearing, and denied Kathy's motion to reopen the evidence to let Foteh testify the day after the bench trial had concluded. Kathy argues Foteh's testimony was relevant because it would (1) show that an attorney-client relationship existed between Kathy and Bui (Michael's attorney), (2) constitute rebuttal testimony to show the affidavit of support does "not contemplate the very specific property disclosures that Michael testified he provided in the I-134," and (3) establish "Michael violated the Violence Against Women Act when he used Kathy's immigration status against her in forcing her to sign the Prenuptial Agreement."

No witness is allowed to offer an opinion on a pure question of law. *Id.*; *Mega Child Care, Inc. v. Tex. Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 309 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Thus, an expert is not allowed to testify directly to her understanding of the law and may only apply legal terms to her understanding of the factual matters in issue. *Greenberg Traurig of N. Y., P.C.*

18

*v. Moody*, 161 S.W.3d 56, 94 (Tex. App.—Houston [14th Dist.] 2004, no pet.). However, an expert may state an opinion on a mixed question of law and fact if the opinion is limited to the relevant issues and is based on proper legal concepts. *Bennett*, 489 S.W.3d at 73; *Moody*, 161 S.W.3d at 94. An issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard. *Bennett*, 489 S.W.3d at 73; *Mega Child Care, Inc.*, 29 S.W.3d at 309. When the trier of fact is equally competent to form an opinion regarding an issue of ultimate fact, the expert's testimony on those issues may be excluded. *Bennett*, 489 S.W.3d at 73.

We conclude the trial court did not abuse its discretion when it precluded Foteh to state her opinion about whether an attorney-client relationship existed between Kathy and Bui.

With regard to her contention that Foteh should have been allowed to testify about the existence of an attorney-client relationship, Kathy states in her brief: "Foteh would have offered testimony directly on point with respect to the various findings of fact regarding whether . . . Bui represented Kathy. If the trial court made findings of fact, presumably, it did not make a series of irrelevant findings. If the findings are relevant, then why wouldn't the expert testimony about the findings be relevant?"

Kathy does no more than question why expert testimony would not be relevant, but she fails to make any argument or explain why testimony about the existence of an attorney-client relationship is in fact relevant to the sole issue that was before the trial court in this case — namely whether the prenuptial agreement is enforceable. Nor does she address why Foteh's testimony is relevant with respect to "findings of fact" when she was not a fact witness and the trial court is the sole factfinder in a bench trial. *See Richard Nugent & CAO, Inc. v. Estate of Ellickson*,

19

543 S.W.3d 243, 260, 263 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Saad v. Valdez*, No. 14-15-00845-CV, 2017 WL 1181241, at *6 (Tex. App.—Houston [14th Dist.] Mar. 30, 2017, no pet.) (mem. op.).

Further, resolution of whether an attorney-client relationship existed between Kathy and Bui required the application of legal principles to Bui's behavior. "The trial judge, presumed to have specialized competency in all areas of the law and a legal expert herself, 'was perfectly capable of applying the law to the facts and reaching a conclusion without benefit of expert testimony from another attorney.'" *See Bennett*, 489 S.W.3d at 74 (quoting *Holden v. Weidenfeller*, 929 S.W.2d 124, 134 (Tex. App.—San Antonio 1996, writ denied). We hold the trial court acted within its discretion when it precluded Kathy's expert from testifying whether an attorney-client relationship existed between Kathy and Bui.

Next, we conclude the trial court did not abuse its discretion when it prevented Foteh from testifying that an I-134 affidavit of support does "not contemplate the very specific property disclosures that Michael testified he provided in the I-134."

Kathy asserts "Foteh would have offered essential rebuttal testimony" regarding the affidavit of support; yet, she fails to explain why testimony about what disclosures an affidavit of support "contemplates" is relevant or "essential" for the trial court's determination whether the parties' prenuptial agreement was unconscionable and thus unenforceable. We further note that Kathy could have introduced the affidavit of support and any relating documents Michael provided in order to rebut his testimony and expose his alleged dishonesty regarding the asserted disclosures in the affidavit. Kathy also could have disputed the veracity of Michael's asserted disclosures during her own testimony. Additionally, even if the affidavit of support does not "contemplate" specific property disclosures, Michael could have nonetheless provided specific disclosures.

20

More importantly, any lack of disclosure of Michael's assets and financial obligations to Kathy would not affect the analysis of unconscionability of the parties' prenuptial agreement. *See* Tex. Fam. Code Ann. § 4.006(a); *Fazakerly*, 996 S.W.2d at 265 ("The issue of unconscionability must be decided by the trial court as a matter of law before the disclosure questions are addressed."); and *Marsh*, 949 S.W.2d at 743. Thus, any testimony about what an I-134 affidavit of support "contemplates" is irrelevant and not "essential". We hold the trial court acted within its discretion when it prevented Foteh from testifying that an I-134 affidavit of support does "not contemplate the very specific property disclosures that Michael testified he provided in the I-134."

Lastly, we conclude that Foteh's testimony regarding any alleged claim under the Violence Against Women Act "VAWA" is irrelevant in this case. Kathy admits as much in her reply brief, stating as follows:

> Foteh's testimony supports the idea that Michael's conduct is illustrative of potential VAWA violations. That being said, Kathy cannot make a VAWA claim in this case because she became a citizen and did not assert any claims within two years of the complained of conduct. See I.N.A. § §204 (a)(1)(A)(iii)(I)(bb) and (iv); (B) (ii)(I)(bb) and (iii)). In addition, the complained of conduct occurred prior to marriage and one must be married or a putative spouse to assert a VAWA claim.

Thus, we hold the trial court acted within its discretion when it precluded Foteh from testifying about the Violence Against Women Act. Accordingly, we overrule Kathy's third issue.

## CONCLUSION

We affirm the trial court's judgment.

21

/s/    Meagan Hassan
Justice


Panel consists of Justices Christopher, Jewell, and Hassan.