**Affirmed and Memorandum Opinion filed October 26, 2021.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-20-00298-CV

---

### THOMAS BART MAXWELL, JR., Appellant

### V.

### DANIELLE LEMOINE MAXWELL, Appellee

---

**On Appeal from the 322nd District Court**
**Tarrant County, Texas**
**Trial Court Cause No. 322-619363-17**

---

## MEMORANDUM OPINION

Thomas Bart Maxwell, Jr. ("Husband") and Danielle Lemoine Maxwell ("Wife") were married on June 30, 2006 and divorced approximately seven years later. The parties signed a "Final Agreed Decree of Divorce" on October 7, 2013, dividing their money and other assets approximately in half. However, the divorce decree also awarded to Husband the full equity interest he held in his employer, Home Care Home Base (the "HCHB interest"). In the years following the parties' divorce, Husband's equity interest underwent several partial sales for a total of

approximately $14 million in proceeds.

In May 2017, Wife filed a petition for bill of review. In her second amended petition, Wife alleged that, during their divorce, Husband (1) made material misrepresentations regarding the characterization of the HCHB interest, and (2) simultaneously threatened Wife with financial ruin if she retained her own divorce attorney. Wife alleged that this extrinsic fraud prevented her from asserting a meritorious claim for the HCHB interest.

The trial court held a bill of review hearing in September 2018. After hearing evidence and the argument of counsel, the trial court signed an order granting the bill of review and setting aside the parties' property division as set forth in their 2013 divorce decree.

The parties proceeded to a jury trial and the trial court signed a final judgment on December 18, 2019. With respect to assets other than the HCHB interest, the trial court's final judgment retained approximately the same division as set forth in the parties' 2013 divorce decree. With respect to the HCHB interest, the trial court awarded Wife $3,152,726.50 as her portion of the asset. The trial court also awarded Wife $100,000 in attorney's fees.

Husband appealed and Wife filed a cross-appeal. For the reasons below, we affirm the trial court's final judgment.[1]

**OVERVIEW**

The issues raised in this appeal address three separate parts of the underlying proceeding: the order granting the bill of review, the trial court's subsequent

---

[1] This case was transferred to this court from the Second Court of Appeals by Texas Supreme Court Transfer Order, Misc. Docket No. 20-9048. Because of the transfer, we must decide the case in accordance with the precedent of the Second Court of Appeals if our decision otherwise would have been inconsistent with that court's precedent. *See* Tex. R. App. P. 41.3.

2

property division, and the trial court's attorney's fees award. We delineate our analyses accordingly, beginning with the bill of review proceeding.

A bill of review has three substantive elements: (1) a meritorious claim or defense to the underlying judgment, (2) an excuse justifying the failure to present that claim or defense based on the fraud, accident, or wrongful act of the opposing party, and (3) an excuse unmixed with the petitioner's fault or negligence. *Baker v. Goldsmith*, 582 S.W.2d 404, 406-07 (Tex. 1979). Challenging the trial court's order granting the bill of review, Husband asserts Wife did not make the requisite showing with respect to these three elements. Husband also contends the trial court's findings of fact with respect to these elements are insufficient. We overrule Husband's challenges.

Next, our analysis turns to the trial court's property division. On this point, the parties' arguments focus on the trial court's division of the HCHB interest. In three issues, Husband asserts:

1. the HCHB interest was not community property;
2. the evidence is legally and factually insufficient to support the trial court's division of the HCHB interest; and
3. the trial court issued insufficient findings of fact with respect to the property division.

In her cross-appeal, Wife asserts the trial court incorrectly valued the HCHB interest. We overrule Husband's and Wife's issues with respect to the trial court's property division.

Finally, Husband and Wife challenge the trial court's attorney's fees award. We overrule these challenges and affirm the trial court's final judgment.

3

## I.   Bill of Review

### A.   Governing Law and Standard of Review

A bill of review is an independent action to set aside a judgment that is no longer appealable or subject to challenge by a motion for new trial. *PNS Stores, Inc. v. Rivera*, 379 S.W.3d 267, 275 (Tex. 2012); *Baker*, 582 S.W.2d at 406. Courts narrowly construe the grounds on which a plaintiff may obtain a bill of review due to Texas's fundamental public policy favoring the finality of judgments. *Mabon Ltd. v. Afri-Carib Enters., Inc.*, 369 S.W.3d 809, 812 (Tex. 2012) (per curiam); *see also Okon v. Boldon*, No. 02-14-00334-CV, 2015 WL 4652775, at *4 (Tex. App.—Fort Worth Aug. 6, 2015, no pet.) (mem. op.) ("the grounds on which a petitioner may obtain relief by bill of review are narrow and defined"). To set aside a judgment by bill of review, the petitioner must plead and prove (1) a meritorious defense to the cause of action alleged to support the judgment, (2) that she was prevented from making by fraud, accident, or wrongful act of her opponent, (3) unmixed with any fault or negligence of her own. *Baker*, 582 S.W.2d at 406-07; *see also Moseley v. Omega OB-GYN Assocs. of S. Arlington*, No. 2-06-291-CV, 2008 WL 2510638, at *2 (Tex. App.—Fort Worth June 19, 2008, pet. denied) (mem. op.) (per curiam).

We generally review the ruling on a petition for bill of review for an abuse of discretion. *See Kukuk v. Kukuk*, No. 02-14-00382-CV, 2015 WL 4504224, at *1 (Tex. App.—Fort Worth July 23, 2015, no pet.) (mem. op.). To determine whether the trial court abused its discretion, we must decide whether the court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). "An appellate court cannot conclude that a trial court

4

abused its discretion merely because the appellate court would have ruled differently in the same circumstances." *Kukuk*, 2015 WL 4504224, at *1.

Under the abuse of discretion standard, challenges to the sufficiency of the evidence are not independent grounds of error but instead are relevant factors in assessing whether the trial court abused its discretion. *Okon*, 2015 WL 4652775, at *3. The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence of a substantive and probative character supports its decision. *Kukuk*, 2015 WL 4504224, at *1 (citing *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (per curiam)). Moreover, the trial court "is the fact-finder at a hearing on a bill of review and has the duty of ascertaining the true facts, and it is within the court's province to judge the credibility of the witnesses and to determine the weight to be given their testimony." *Okon*, 2015 WL 4652775, at *3 (internal quotation omitted).

## B. Evidence and the Trial Court's Ruling

Husband challenges whether sufficient evidence supports the trial court's findings regarding the three elements necessary to grant a bill of review. *See Baker*, 582 S.W.2d at 406-07. Before addressing these specific arguments, we summarize the testimony and evidence presented at the bill of review hearing. The bill of review hearing was separated into two parts: in the first part, Wife presented evidence to establish a meritorious defense to the 2013 property division. In the second part of the hearing, the evidence addressed the two remaining bill-of-review elements.

### 1. First Part of Hearing

Husband was the first witness to testify at the hearing. Admitted into evidence during Husband's testimony was the parties' divorce decree signed on

October 7, 2013.  Under the heading "Division of Marital Estate", the decree states that:  "The Court finds that the following is a just and right division of the parties' marital estate, having due regard for the rights of each party."  Reviewing this division, Husband agreed that it divides "almost all of [the] marital property 50-50".  The divorce decree also states that Husband would retain 100% of the HCHB interest.  Husband testified that, at the time of the divorce, his equity interest was "just over 1 percent".

Also admitted into evidence during Husband's testimony was a worksheet he filled out with the title "Inventory and Appraisement".  According to Husband, his attorney gave him the worksheet to complete in August 2013 as part of his preparation for the divorce.  The HCHB interest was included in the portion of the worksheet entitled, "Community Estate of the Parties".  Husband listed the HCHB interest as "[a]pproximately 1.086 percent" and valued it at $2.6 million.  The portion of the worksheet entitled "Separate Estates of the Parties" is struck through and there are no separate assets listed.

Husband testified that he sold a percentage of the HCHB interest on December 19, 2013, for approximately $6.7 million.  Husband said Wife was "well aware" of the HCHB interest; according to Husband, he had sold a portion of the HCHB interest for "[a] little over a million bucks" in 2011.  Husband testified that he used this sale to estimate the value of the HCHB interest he included on the "Inventory and Appraisement" worksheet.

Wife was the second witness to testify at the hearing.  According to Wife, she was 47 years old at the time of the hearing and had completed one year of college.  Wife said she and Husband were married on June 30, 2006; according to Wife, neither she nor Husband brought substantial financial assets into the marriage.  Wife testified that Husband "handled the finances" during their

6

marriage and said that she did not "feel that [she] had the ability to make purchases when [she] wanted to." Wife testified that Husband "controlled all the banking and the money" and monitored her spending.

Wife described Husband as "controlling" during their marriage. According to Wife, Husband would call her repeatedly during the day and, if she did not answer, "he would call [her] four and five more times and text [her] until [she] answered the phone." Describing their daily routine, Wife testified that Husband expected her to "stand with him while he was taking a shower, while he was getting ready, [and] walk[] him to the door or out to the car." When Husband returned home in the evening, Wife said he expected her "to be there in the doorway or in the garage when he pulled in." Wife said that, if she did not meet these expectations, Husband "would get mad".

Wife said Husband encouraged her to get two breast augmentations. According to Wife, Husband repeatedly told her that her breasts were "saggy" and "weren't big enough." At an appointment with a plastic surgeon, Wife said Husband picked the size of her breast implants.

Wife said Husband became "more controlling" and "more demanding" after selling a portion of the HCHB interest in 2011. Wife said she was expected to "make the bed every morning the way that he liked it" and fold Husband's laundry "a certain way." Wife testified that she would organize Husband's closet for him. Wife recalled that, on an occasion when the closet organization did not meet Husband's expectations, he "took everything out of the closet, threw it in the middle of the rotunda in the bedroom and told [her] to figure out how to fix it, so it never happened again."

Wife said she used to work a full-time job but Husband encouraged her to quit because she "couldn't have a full-time job and work and build the house."

7

According to Wife, she did not feel like she could choose to keep working. Wife also testified that Husband had "rules" for her when they entertained guests at their home, including ensuring the cigar ashtrays did not get too full and refilling Husband's drink when it reached a certain level.

In July 2013, Wife found out that Husband was having an affair with another woman. Wife said she was "crying and very hysterical, very upset" when she confronted Husband. According to Wife, Husband told her "that he was done and he wanted a divorce." Wife said she "[b]egged and begged him and cried for him not to do it and told him [they] could work on it and [they] would figure it out." Wife testified that Husband told her, "[i]f [she] weren't such a bad wife, [he] wouldn't [have] had to cheat on [her]."

When discussing the divorce, Wife recalled that Husband told her "[t]here's no reason for either of [them] to have an attorney" because they would "split the cash in the bank and the house." Wife testified that Husband also told her not to tell anyone about the divorce, including her friends. Wife said Husband later retained an attorney that he said was "just to draw up the documents." Wife told Husband she too was going to hire a lawyer and he told her that, if she did, "he would throw [her] and [her] four dogs out on the street with no money" and that she "wouldn't get anything." Wife recalled Husband telling her that she "was lucky that he was giving [her] half because it was all from the proceeds of his [HCHB] shares that were not [hers]." According to Wife, Husband told her his attorney confirmed the HCHB interest was his separate property.

After Husband told her he wanted a divorce, Wife said she purchased a secret phone to communicate with her friends without Husband knowing. Wife said her friends encouraged her to speak with an attorney. Wife met with an attorney on July 31, 2013, and signed a fee agreement entitled "Potential Divorce

8

Matter — Limited Scope Fee Agreement — Legal Advice ONLY". The portion of the fee agreement entitled "LIMITED SCOPE OF REPRESENTATION" includes the following:

[The attorney] may:

- Review any pleadings or documents regarding your divorce.
- Provide you with legal advice regarding your divorce.

[The attorney's] representation specifically DOES NOT include the following:

- Filing or signing an answer, response, or any other pleadings, or otherwise making an appearance in your divorce matter.
- Corresponding with the opposing party, or the court on your behalf.
- Preparing for or attending any hearing, mediation, or settlement negotiations on your behalf.

According to Wife, she was "hysterically crying" when she met with the attorney and told the attorney that Husband "absolutely could not find out that [she] was there." Wife said the attorney contacted her once by emailing a billing statement to her friend's email address. The billing statement was sent on August 13, 2013, and noted that $1,000 had been paid, $380 of which was deducted for an "initial consultation" on July 31, 2013.

After the parties rested, the trial court concluded Wife "met the prima facie proof in the meritorious defense in this case, which is not barred as a matter of law." The parties proceeded to the second part of the hearing, which addressed whether (1) Wife was prevented from making her defense by fraud, accident, or wrongful act of Husband, (2) unmixed with any fault or negligence of her own. *See Baker*, 582 S.W.2d at 406-07.

9

## 2. *Second Part of Hearing*

Five witnesses testified during the second portion of the bill of review hearing.

The first witness to testify was Jim Griffin, who worked with Husband at HCHB. According to Griffin, he received a 1% equity interest in HCHB in August 2010; at this time, Griffin said, Husband already owned a 3% equity interest in HCHB. Griffin described himself and Husband as part "owners" of HCHB and members of the "executive team".

According to Griffin, 85% of HCHB was sold to the Hearst Corporation ("Hearst") in a transaction that closed on December 19, 2013. Griffin said the company knew in "March of 2013 that we were going to go to market" and that he and Husband discussed the pending sale throughout 2013. Griffin also testified that he and Husband participated in meetings with potential buyers of HCHB. Griffin said that in "the May-June [2013] time frame", it was estimated that the market value of the sale would be $450-525 million. Griffin said the final price for the December 2013 sale exceeded $525 million.

Griffin said he received $3.9 million from the 2013 sale. According to Griffin, Husband received "a little less than two — less — less than two times what [Griffin] received."

Francine Cohan was the second witness to testify. Cohan said she met Husband and Wife in June 2012, when she moved to their neighborhood. Cohan said she and Wife "became friends and started seeing each other for lunches and things of that nature." According to Cohan, once she got to know Wife "it was evident . . . that [Wife] was afraid" of Husband. Cohan testified that Wife was "always kind of on edge" and was "constantly making sure everything was just so"

because Husband "liked things a certain way." According to Cohan, Wife did not "communicate much when [Husband] was in town".

Cohan said Wife called her the night she discovered that Husband was having an affair. Cohan recommended to Wife that she get an attorney and told her to get a "communication device that [Husband] did not have access to and did not pay for or wouldn't be able to look into." According to Cohan, Wife "was extremely afraid of having an attorney locally" in case the attorney knew Husband. Cohan recalled that Wife "had been told not to contact an attorney, and if she did contact an attorney, [Husband] would throw her out on the streets." Cohan said Wife eventually visited with an attorney and used Cohan's email address to receive an email regarding payment. Cohan did not receive any other emails from an attorney during the pendency of the divorce.

In the months preceding the divorce, Cohan said Wife's health deteriorated:

[Wife] became very thin very quickly. She was not eating. She was unable to eat anything. What she did eat, it did not stay with her. She was distraught. She cried constantly. Bawled, sobbing constantly. . . . She was a complete . . . she was a train wreck. She was not in a good state of mind.

Cohan said she also was concerned that Wife continued to have sex with Husband during this period of time. Cohan recalled Wife telling her that "[Husband] said too bad they didn't get along this great when they were married and that he had to divorce her." According to Cohan, Wife seemed to think she "was going to be able to win [Husband] back by having sex with him". Cohan said Wife was not making "much" sense during that time and described her as follows:

It was — it was difficult to speak with [Wife]. She — her thoughts were erratic. She was, you know, all over the place with her line of thinking. She was very concerned about her well-being, the well-being of her animals. Where was she going to live? What she was

11

going to do? What was going on with [Husband's] situation? . . . Getting her to calm down and talk was very difficult.

Cohan testified that Wife moved to Arizona in September 2013. Cohan said Wife kept in contact with Husband and returned to Dallas to visit him. According to Cohan, Wife bought a house in Tarrant County, Texas in 2014.

Dr. Albritton, a forensic psychologist, was the third witness and testified regarding Wife's "psychological functioning prior to the end of 2013 as well as what followed it in terms of her cognitive ability as well as her depression." To reach his conclusions, Dr. Albritton said he reviewed affidavits from two of Wife's friends, including Cohan; therapy records and notes from Wife's psychologist, Tina Johnston; texts; emails; pictures; and Husband's deposition. Dr. Albritton also said he met with Wife three times.

Based on his review of Johnston's records and notes, Dr. Albritton said Wife had 87 visits with Johnston from December 2013 through 2016. Dr. Albritton testified that this number of visits is "indicative of the level of distress that [Wife] was in at the time she began therapy." According to Dr. Albritton, Johnston described Wife as a "puddle" who was "having a great deal of trouble functioning"; Johnston also noted that Wife had "[b]ad hygiene", "inappropriate, almost disheveled grooming", and was "almost anorexic." Johnston stated in her notes that Wife had a "flat affect" with "no expression" except "occasionally being tearful." According to Dr. Albritton, Johnston's impression was that Wife "was having tremendous trouble putting thoughts together in a meaningful way" and had "some cognitive impairment." Dr. Albritton testified that Johnston diagnosed Wife as having severe major depression and an anxiety disorder. Johnston "recommended, in fact, almost insisted on inpatient hospitalization" and made a "psychiatric referral" based on the issues she observed with Wife. According to

Dr. Albritton, Wife declined hospitalization but continued to visit Johnston several times a week for therapy.

Dr. Albritton testified that Johnston's notes also included impressions of Wife's relationship with Husband. According to the notes, Wife "felt fearful" and felt like Husband "was dictating her behavior, and . . . specifically mentioned the attorney issue because of his threats." Johnston also noted that "there was a significant amount of coercion and control in [Husband's and Wife's] relationship" and she was concerned about Wife's "level of dependency".

Based on his review of the information given to him, Dr. Albritton opined that Wife had been conforming her behavior to Husband's expectations and "had lost her sense of agency or sense of autonomy". Discussing Wife's capacity when she signed the divorce decree in October 2013, Dr. Albritton stated it "was more likely than not that [Wife's] judgment was significantly impaired".

According to Dr. Albritton, Wife was "psychologically or neurologically impaired" in her dealings with Husband "[p]articularly, continuing after the divorce in a relationship, that was very unusual." After Wife moved to Arizona, Dr. Albritton testified that she would continue to visit Husband and "was very hopeful that somehow the relationship would be, you know, resurrected." Dr. Albritton also said Wife had "difficulty setting appropriate boundaries" and noted that her sexual relationship with Husband "turned into what [Wife] described as more of a bondage-servant-slave-master relationship." Dr. Albritton said Wife maintained this relationship with Husband for at least a year after the divorce.

Dr. Albritton said he first met with Wife in January 2014 and said "she was still kind of disorganized and her thoughts were not a hundred percent clear". According to Dr. Albritton, Wife had a conversation with a friend in the summer of 2016 "that led her to become — start questioning whether there had been foul gain

13

in the divorce".

Husband testified again during the second part of the bill of review hearing. During Husband's testimony, portions of his video-taped deposition were played. In the first clip, Husband testified that he retained an attorney to draft "an uncontested divorce decree." Husband said he told Wife that, "if she worked with [him] and the lawyer that [he] had hired, that [he] would treat her fairly and give her what she was due".

During the second and fourth deposition clips, Husband testified that Wife did not know how much the HCHB interest was worth in 2013. Husband said his opinion that the HCHB interest was his separate property was based on "[his] opinion and Google."

Testifying at the hearing, Husband said he and Wife talked about her hiring an attorney for the divorce proceeding. According to Husband, he and Wife "had a discussion around [sic] there was no reason to. This was a very common, split-everything divorce." Husband acknowledged telling Wife that he "wanted to keep the divorce proceedings secret" and did not want her "to discuss [their] personal life with people in the neighborhood or people in the industry or her friends." Husband said Wife agreed to keep the divorce a secret. Husband said he and Wife put together the "Inventory and Appraisement" worksheet valuing their assets.

Husband testified that Wife was financially dependent on him after she stopped working. According to Husband, Wife "appear[ed] anxious about that" and said "[s]he didn't like it that she didn't have a job." But according to Husband, Wife also "did not like where she was working" and "had a long commute." Husband said Wife "was making very little money" at her job and it "was probably a big distraction from us trying to get our house built." Husband agreed that it was his preference that Wife stop working to focus on getting the

home build completed.

After the divorce, Husband recalled that Wife asked him to come back "multiple times." Husband said Wife was "sad" after the divorce but "every time [they] were together, she was in a great place." Even after their divorce, Husband said he and Wife "had a relationship, and [they] had lots of sex, amazing sex."

Wife was the last witness to testify at the hearing. Describing her marriage to Husband, Wife said there was no limit on what she would do for him. Even after the divorce, Wife said she "would have done anything" to keep Husband in her life. Wife said she went along with Husband's sexual requests because she "would have done anything for him because [she] was still in love with him." Wife said she "[s]ometimes" had bruises "as a result of the sexual activities". Wife also said she continued to write Husband "long emails . . . pretty much every day" because she "was in love with him."

Wife said she believed Husband when he told her the HCHB interest was his separate property. Wife said she never saw any documents pertaining to the HCHB interest.

Wife also was questioned about the attorneys she retained before and after the divorce proceeding. Wife said she retained an attorney in 2013 and had a one-hour initial consultation. Wife said she did not have any further interactions with the attorney out of "fear."

Wife said she signed a second contract for legal representation in April 2014. According to Wife, she had one phone call with an attorney because she had questions about the allotment of the sales proceeds from the parties' marital home.

Wife said she saw therapist Johnston for two-to-three years after the divorce and did not work during this time. Wife said she returned to work full-time in

February 2016. Wife said that, in the summer of 2016, she had a conversation with a friend that led her to think she could have had a claim to the HCHB interest. Wife said she retained her current attorneys in August 2016 because she "was suspicious if maybe [Husband] had not been honest with [her] during the divorce . . . about the HCHB shares."

Wife recalled that, when she visited with her attorneys in August 2016, she did not have any records or documents regarding the HCHB interest but only had the divorce decree. Wife agreed that it was "important . . . to know for sure that [she] w[as] on solid footing" before going forward with her petition for bill of review because of the cost it would incur. Wife also said she had to "really, really think about" whether she wanted to "challenge" Husband. According to Wife, the petition for bill of review was filed approximately nine months after she consulted with her attorney. Wife said she brought the bill of review proceeding "[t]o stand up for [her]self and to stand up to [Husband] for the first time."

### 3. The Trial Court's Ruling

On September 27, 2018, the trial court signed an order granting Wife's petition for bill of review.

On November 1, 2018, the trial court signed a "Corrected and Clarified Order from the 'Baker Hearing' for the Bill of Review." In this order, the trial court clarified the extent to which the 2013 divorce decree was set aside:

> In granting the Bill of Review, the Court hereby sets aside only the property division as set forth in the Decree of Divorce signed on October 7, 2013. The Court will divide the parties' community estate existing as of October 7, 2013 on final trial.

After trial, the trial court issued findings of fact and conclusions of law. In its "Additional or Amended Findings of Fact and Conclusions of Law (Second)", the

16

trial court issued the following findings with respect to the bill of review proceeding:

1.    Petitioner herein, [Wife], established facts sufficient to constitute a meritorious defense to the original 2013 property division.

2.    Petitioner herein, [Wife], established that the original 2013 property division was rendered as the result of fraud of [Husband].

3.    Petitioner herein, [Wife], established that the fraud was unmixed with any fault or negligence of her own.

## C.    Husband's Challenge to the Bill of Review Elements

On appeal, Husband challenges whether sufficient evidence supports the trial court's findings that Wife (1) had a meritorious defense, (2) which she was prevented from making by Husband's fraud, (3) unmixed with any fault or negligence of her own. We examine these elements individually.

### 1.    *Meritorious Defense*

In a bill of review proceeding, the petitioner must first, as a pre-trial matter, present prima facie proof to support the alleged meritorious defense or claim. *Baker*, 582 S.W.2d at 408; *Elliott v. Elliott*, 21 S.W.3d 913, 917 (Tex. App.—Fort Worth 2000, pet. denied). A prima facie defense or claim is presented if the trial court determines that (1) the petitioner's claim or defense is not barred as a matter of law and (2) the petitioner will be entitled to judgment on re-trial if no contrary evidence is offered. *Baker*, 582 S.W.2d at 408-09; *Elliott*, 21 S.W.3d at 917.

Whether a prima facie showing has been made is a question of law for the court. *Elliott*, 21 S.W.3d at 917. Prima facie proof may be comprised of documents, answers to interrogatories, admissions, and affidavits on file along with such other evidence that the trial court may receive in its discretion. *Baker*, 582 S.W.2d at 409; *Elliott*, 21 S.W.3d at 917. The bill of review respondent may

17

respond with like proof showing that the petitioner's claim or defense is barred as a matter of law, but any fact questions are resolved in favor of the petitioner for purposes of this pre-trial determination. *Baker*, 582 S.W.2d at 409; *Elliott*, 21 S.W.3d at 917.

"In cases involving bills of review to set aside divorce decrees regarding division of property, courts have held that a meritorious claim is presented by proof that the petitioner would obtain a more favorable property division on retrial." *Elliott*, 21 S.W.3d at 919 (internal quotation omitted). Analyzing this element in a similar context, the Fort Worth Court of Appeals cited at length the reasoning from *Martin v. Martin*, 840 S.W.2d 586 (Tex. App.—Tyler 1992, writ denied):

> *Martin* illustrates the type of proof which would suffice to present a prima facie meritorious defense by a complainant such as [the wife]. In the divorce decree in that case, Wife received her jewels, a new Cadillac, $44,000 in cash and $3,000 per month for 120 months as contractual alimony. Husband received the remainder of the property, including stock in a business he managed, which he listed as separate property worth approximately $2 million. Wife filed a bill of review some two years later, claiming that she had suffered from severe depression during the period of the divorce, that Husband had taken advantage of her condition and threatened to seek custody of the couple's only child if she pursued discovery, and that he misrepresented that the stock was his separate property and that the company was in a precarious financial condition.
>
> At a *Baker v. Goldsmith* hearing, Wife offered evidence discovered by her subsequent to the divorce that the stock was community property, that Husband paid himself a dividend of approximately $2.8 million shortly after the divorce became final, and that there had been $6 million in retained earnings in the company at the time of the divorce. Based on this evidence, the court of appeals in *Martin* concluded that the trial court erred in dismissing Wife's bill of review on the ground that, as a matter of law, she did not present prima facie proof of a meritorious claim. The court of appeals held that, by this evidence,

Wife "demonstrated that she would obtain a more favorable property division on retrial."

*Elliott*, 21 S.W.3d at 919-20 (quoting *Martin*, 840 S.W.2d at 589-90).

Guided by this reasoning, we conclude the trial court did not abuse its discretion by concluding that Wife met her burden to present prima facie proof of a meritorious claim to the property division in the 2013 divorce decree.[2]  The decree divided most of the parties' marital estate into two approximately equal portions. However, the divorce decree also awarded Husband all the HCHB interest.

Conflicting evidence was presented regarding whether the HCHB interest was part of the community estate or was Husband's separate property.  *See Irvin v. Parker*, 139 S.W.3d 703, 708 (Tex. App.—Fort Worth 2004, no pet.) (whether property is characterized as community or separate is a question of fact).  The divorce decree lists the HCHB interest as part of the "Marital Estate", which includes the parties' other community assets.  On his "Inventory and Appraisement" worksheet, Husband listed the HCHB interest as part of the "Community Estate of the Parties" and struck through the portion of the worksheet entitled "Separate Estates of the Parties".  But Wife also testified that, prior to the divorce, Husband told her the HCHB interest was his separate property — a classification that, Husband told Wife, he had confirmed with his attorney.  Under the applicable standard of review, we resolve this factual dispute in Wife's favor and conclude she presented evidence sufficient to establish a prima facie case that the HCHB interest is community property.  *See Baker*, 582 S.W.2d at 409; *Elliott*, 21 S.W.3d at 917.

Evidence at the hearing also showed that, approximately two months after

_____

[2] For this analysis, we rely on the evidence presented during the first part of the bill of review hearing.

19

the parties signed the divorce decree, Husband sold a portion of the HCHB interest for $6.7 million. As evidenced by this sale, the HCHB interest was a substantial asset in the divorce — an asset that was awarded to Husband in full.

As the Fort Worth Court of Appeals noted, the proof in *Martin* sufficed to present a meritorious defense to a prior property division. *See Elliott*, 21 S.W.3d at 919-20 (citing *Martin*, 840 S.W.2d at 589-90). Specifically, the wife in *Martin* produced evidence showing (1) the parties' divorce decree awarded to the husband certain stock in a business he managed; (2) the stock was valued at approximately $6 million at the time of the divorce; and (3) the stock was community property. *See id*.

Here too, Wife presented evidence showing (1) the parties' divorce decree awarded Husband all the HCHB interest; (2) a portion of this interest was sold for $6.7 million two months after the parties signed the divorce decree; and (3) the HCHB interest was community property. No evidence was presented showing that Wife's claim was barred as a matter of law. Accordingly, the trial court did not err by finding that Wife presented prima facie proof to support the alleged meritorious claim to the parties' 2013 property division.

We overrule Husband's challenge to this finding.

### 2. *Extrinsic Fraud*

To secure a bill of review, the petitioner must establish by a preponderance of the evidence that the prior judgment was rendered as a result of fraud, accident, or wrongful conduct of the opposite party. *Baker*, 582 S.W.2d at 409. Here, according to the findings of fact and conclusions of law, the trial court found that the parties' 2013 property division was rendered as a result of Husband's fraud.

In the bill of review context, extrinsic fraud is wrongful conduct that

20

occurred outside the challenged trial proceeding and affected the manner in which the judgment was procured. *Montgomery v. Kennedy*, 669 S.W.2d 309, 312 (Tex. 1984). Extrinsic fraud prevents a real trial upon the issues presented and includes acts such as keeping a party away from court, making false promises of compromise, and denying a party knowledge of the lawsuit. *Id*.; *see also Boaz v. Boaz*, 221 S.W.3d 126, 131 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Extrinsic fraud is collateral fraud in the sense that it must be collateral to the matter tried and not something that was actually or potentially an issue in the challenged proceeding. *Montgomery*, 669 S.W.2d at 312. Extrinsic fraud requires proof of some deception practiced by the adverse party that was collateral to the underlying action. *McIntyre v. Wilson*, 50 S.W.3d 674, 680 (Tex. App.—Dallas 2001, pet. denied).

Conversely, intrinsic fraud relates to the issues that were presented and were or should have been settled in the former action. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 752 (Tex. 2003). Intrinsic fraud includes fraudulent instruments, perjured testimony, or any matter that was presented to and considered by the trial court in rendering the challenged judgment. *Id*. Intrinsic fraud does not support a bill of review because each party must guard against adverse findings on issues directly presented. *Id*. Thus, "[a]s a matter of law, misrepresentation with respect to the value of known community assets does not alone constitute extrinsic fraud." *Rathmell v. Morrison*, 732 S.W.2d 6, 13 (Tex. App.—Houston [14th Dist.] 1987, no writ).

Several courts have considered similar cases where, as here, the wife alleged that the husband's threats or deception kept her from pursuing a claim to community assets. Most recently, the Corpus Christi Court of Appeals examined whether this type of evidence was sufficient to defeat a motion for summary

21

judgment on the wife's petition for bill of review. *See Hester v. Prickett*, No. 13-11-00677-CV, 2012 WL 3252721, at *3-4 (Tex. App.—Corpus Christi Aug. 9, 2012, pet. denied) (mem. op.). In her summary judgment response, the wife in *Hester* attested that, when she was going through the process of divorcing her husband, she "immediately requested her husband to disclose all assets, including any business interest or entitlement whether by stock option or otherwise." *Id.* at *4. The wife said her husband told her he did not have any ownership in his employer and "told her that he would make her sorry if she made him waste his time and money on a lawyer to answer discovery." *Id.* Concluding this evidence was sufficient to raise an issue of fact with respect to extrinsic fraud, the court held that "[f]raudulent concealment, in addition to threats designed to coerce a spouse into not investigating the other party's financial status, is sufficient to establish extrinsic fraud". *Id.*; *see also Hill v. Steinberger*, 827 S.W.2d 58, 62 (Tex. App.—Houston [1st Dist.] 1992, no writ) (wife raised an issue of fact on extrinsic fraud where husband "admitted he made fraudulent misrepresentations concerning [wife's] need for an attorney in the divorce proceedings, and that those fraudulent misrepresentations were made in order to induce [wife] to refrain from hiring a lawyer").

In *Rathmell v. Morrison*, the husband challenged the trial court's order granting his former wife's petition for bill of review and asserted there was no evidence of extrinsic fraud. 732 S.W.2d at 13. Reviewing the evidence, this court noted:

> [T]he record contains evidence not only of a misrepresentation of the market value of the Rathmell companies but also threats by [husband] that if [wife] obtained an interest in the companies or even if she merely insisted on having the companies appraised, [husband] would dissolve the companies, close them down and walk across the street and start new companies.

*Id.* at 14. Concluding this evidence was sufficient to support a finding of extrinsic fraud, this court held that, "[i]f [wife] was induced by [husband's] threat to forego an appraisal and agreed to the property settlement agreement based on [husband's] representations regarding the value of the companies, she was prevented from having a fair opportunity of presenting in the divorce trial evidence concerning the value of the companies." *Id.*; *see also Vickery v. Vickery*, No. 01-94-01004-CV, 1997 WL 751995, at \*24-25 (Tex. App.—Houston [1st Dist.] Dec. 4, 1997, pet. denied) (op. on reh'g, not designated for publication) (evidence sufficient to support finding of extrinsic fraud because the wife testified that her husband "duped her into getting the divorce by persuading her that it was necessary to protect the family's assets and that the couple would reunite").

Examined in light of these authorities, the evidence presented at the bill of review hearing is sufficient to support the trial court's finding that extrinsic fraud prevented Wife from asserting her claim to the HCHB interest in the 2013 property division.

When the parties were preparing to divorce, Wife recalled Husband telling her there was "no reason for either of [them] to have an attorney" because they would "split the cash in the bank and the house." According to Wife, Husband told her she "was lucky that he was giving [her] half because it was all from the proceeds of his [HCHB interest] shares that were not [hers]." Wife said Husband told her his HCHB interest was his separate property and that he had confirmed that classification with his attorney. Wife also said that Husband instructed her not to tell anyone about their divorce.

Wife testified that, when she told Husband that she too was going to hire an attorney, Husband told her "he would throw [her] and [her] four dogs out on the street with no money" and that she "wouldn't get anything." Wife said her friends

encouraged her to see an attorney before finalizing the divorce and that she met with an attorney once in July 2013 for a one-hour consultation. According to Wife, she did not have any further contact with the attorney out of "fear."

Similarly, Cohan also testified that Wife "had been told not to contact an attorney, and if she did contact an attorney, [Husband] would throw her out on the streets." Cohan also recalled that Wife "was extremely afraid of having an attorney locally" in case the attorney knew Husband. Cohan described Wife as "erratic" during this time and said Wife was concerned about "her well-being", "the well-being of her animals", and where she was going to live. And according to Dr. Albritton's testimony, Husband's threats to Wife regarding her retention of an attorney also were mentioned in Johnston's notes taken during Wife's therapy.

Evidence of these threats comports with other testimony addressing the broader nature of Husband's and Wife's relationship. In her testimony, Wife described Husband as "controlling" and "demanding" and said he had total control over their finances. Wife said she did not feel like she had the ability to make purchases when she wanted to and recalled that Husband monitored her spending. Wife also testified that Husband was demanding with respect to how certain household tasks were completed and expected Wife to immediately attend to his needs. Likewise, Cohan testified that, once she got to know Wife, "it was evident . . . that [Wife] was afraid" of Husband.

This evidence supports the conclusion that Husband threatened Wife and told her that, if she retained an attorney in the divorce proceeding, she would not get anything from the division of the parties' estate. As in the cases discussed above, these threats constitute extrinsic fraud, *i.e.*, conduct that occurred outside the challenged trial proceeding that affected the manner in which the judgment was procured. *See, e.g., Hester*, 2012 WL 3252721, at *3-4; *Vickery*, 1997 WL

24

751995, at *24-25; *Hill*, 827 S.W.2d at 62; and *Rathmell*, 732 S.W.2d at 13-14. Based on this evidence, the trial court's finding that the 2013 property division was rendered as a result of Husband's fraud does not constitute an abuse of discretion.

Challenging this finding, Husband contends that the evidence does not show that he prevented Wife from obtaining an attorney during the divorce proceedings. To support this argument, Husband points to evidence showing that Wife (1) consulted with an attorney in July 2013; (2) signed a fee agreement and paid a retainer fee; and (3) purchased a secret flip phone to communicate with her attorney.

But the record also contains evidence showing that Husband's threats prevented Wife from having anything more than an initial consultation with the attorney. Specifically, Wife testified that she only had a one-hour consultation with the attorney and did not have any further interactions with the attorney out of "fear." Likewise, Wife's fee agreement with the attorney was very limited and provided only that the attorney would review documents and give legal advice; the attorney's representation did not include taking any substantive action in the divorce proceeding on Wife's behalf. Moreover, Wife testified that she used a secret phone and her friend's email address to communicate with the attorney, further underscoring her assertion that she was scared to work with an attorney.

Reconciling this evidence fell to the trial court which, as fact-finder, was charged with "judg[ing] the credibility of the witnesses" and "determin[ing] the weight to be given their testimony." *See Okon*, 2015 WL 4652775, at *3 (internal quotation omitted). We decline to revisit that determination on appeal. The witnesses' testimony and evidence regarding Wife's limited interactions with an attorney and the reasons she did not pursue further legal representation support the trial court's extrinsic fraud finding.

Husband also contends the evidence at the hearing "reveals anything but fraud" and is "far from egregious". Husband points out that there is no evidence of physical or sexual abuse and that "[t]he police were never called to [the parties'] home."

But this argument overstates the evidence necessary to show extrinsic fraud. To prove extrinsic fraud, the petitioner must produce evidence of wrongful conduct that occurred outside the challenged proceeding which affected the manner in which the judgment was procured. *See Montgomery*, 669 S.W.2d at 312. As shown by the authorities discussed above, this showing can be made through evidence of threats or deception that kept the petitioner from pursuing a claim to community assets in a divorce proceeding. *See, e.g., Hester*, 2012 WL 3252721, at *3-4; *Vickery*, 1997 WL 751995, at *24-25; *Hill*, 827 S.W.2d at 62; and *Rathmell*, 732 S.W.2d at 13-14. The cases do not require that the petitioner show physical abuse or similar actions of that nature to establish extrinsic fraud. Accordingly, we will not apply that standard here.

We overrule Husband's challenge to this finding.

### 3.    *Unmixed With Fault or Negligence*

The final element for a bill of review requires the petitioner to show that her failure to raise a meritorious claim or defense was unmixed with any fault or negligence of her own. *See Baker*, 582 S.W.2d at 406-07; *Moseley*, 2008 WL 2510638, at *2. Specifically, the petitioner must show she diligently pursued all adequate legal remedies against a former judgment. *Mabon Ltd.*, 396 S.W.3d at 813; *see also Bergenholtz v. Eskenazi*, No. 05-14-00609-CV, 2015 WL 4481664, at *2 (Tex. App.—Dallas July 23, 2015, pet. denied) (mem. op.). "'Adequate legal remedies' only consists of motions that could have been filed in the trial court's first proceeding and does not include a restricted appeal." *Dias v. Dias*, No. 13-12-

26

00685-CV, 2014 WL 6679525, at *4 (Tex. App.—Corpus Christi Nov. 25, 2014, pet. denied) (mem. op.).

A person who knew or, by the exercise of ordinary prudence, could have known of the judgment in time to have invoked a legal remedy but negligently failed to do so is not entitled to a bill of review. *Hesser v. Hesser*, 842 S.W.2d 759, 765 (Tex. App.—Houston [1st Dist.] 1992, writ denied). "However, an incompetent [person] cannot be negligent." *In re Marriage of Ham*, 59 S.W.3d 326, 332 (Tex. App.—Texarkana 2001, no pet.); *see also id*. at 329, 332 (petitioner raised an issue of fact on negligence element in bill of review proceeding where she alleged she "was unable . . . to exercise such prudence because of her mental condition").

The application of these principles is illustrated in *Rose v. Rose*, 598 S.W.2d 889 (Tex. App.—Dallas 1980, writ dism'd w.o.j.). There, the wife filed for divorce from the husband while the husband (who was diagnosed as an alcoholic and schizophrenic) was confined to a nursing home. *Id*. at 892. As part of the divorce, the wife obtained the husband's signature on a property settlement agreement that awarded all the parties' property to the wife. *Id*. The husband later filed a petition for bill of review to set aside the property agreement, which the trial court granted. *Id*.

On appeal, the wife argued that the evidence did not support the trial court's finding that the husband's failure to assert a meritorious claim or defense was unmixed with his own negligence. *See id*. at 894. Rejecting this argument, the court noted that "[s]everal witnesses, including doctors who saw [the husband], testified that [he] was disoriented, slow, dazed, and on heavy medication at the time" of the divorce and that the husband's medication "caused side-effects such as lethargy and disorientation." *Id*. "This evidence", the court concluded, was

27

"sufficient to support the finding that the [husband] was not negligent in his actions concerning the divorce action." *Id*.

Here too, the record contains evidence sufficient to support the trial court's finding that Wife's failure to assert her claim with respect to the parties' 2013 property division was unmixed with her own fault or negligence.

According to Wife, Husband told her there was "no reason for either of [them] to have an attorney" in the divorce proceedings because they would "split the cash in the bank and the house." Wife testified that Husband threatened her when she said she wanted her own attorney and told her that, if she did, "he would throw [her] and [her] four dogs out on the street with no money" and that she "wouldn't get anything." Wife said she was afraid of Husband's threats and, as a result, only had a single consultation with an attorney with respect to the divorce.

Cohan also testified about Wife's emotional state during the divorce proceedings. Cohan said Wife's health deteriorated quickly and she recalled that Wife "was not eating"; "became very thin"; "was distraught"; "cried constantly"; and "was a train wreck." Cohan recalled that it was "difficult to speak" with Wife during this time and that Wife's thoughts were "erratic".

Cohan also said she was concerned because Wife continued to have sex with Husband. According to Cohan, Wife seemed to think she "was going to be able to win [Husband] back by having sex with him". Similarly, Wife testified that she "would have done anything" to keep Husband in her life and went along with Husband's sexual requests because she "would have done anything for him because [she] was still in love with him." Wife also said she continued to write Husband "long emails . . . pretty much every day" because she "was in love with him."

28

Wife said she did not work for approximately three years after the divorce and had frequent therapy sessions with Johnston. Testifying about these sessions, Dr. Albritton said Johnston described Wife as a "puddle" who was "having a great deal of trouble functioning"; Johnston also noted that Wife had "[b]ad hygiene", "inappropriate, almost disheveled grooming", and was "almost anorexic." Johnston diagnosed Wife as having severe major depression and an anxiety disorder and recommended inpatient hospitalization.

After Wife moved to Arizona, Dr. Albritton testified that she would continue to visit Husband for at least a year and "was very hopeful that somehow the relationship would be, you know, resurrected." Dr. Albritton said Wife had "difficulty setting appropriate boundaries" and noted that her sexual relationship with Husband "turned into what [Wife] described as more of a bondage-servant-slave-master relationship." Dr. Albritton said when he first met with Wife in January 2014, she was "still kind of disorganized and her thoughts were not a hundred percent clear." According to Wife, it was not until summer 2016 that a conversation with a friend led her to think she could have had a claim to the HCHB interest.

This evidence supports the conclusion that Wife was emotionally distraught and exhibiting symptoms consistent with severe major depression and an anxiety disorder before, during, and after her divorce from Husband. Accordingly, this evidence is sufficient to support the trial court's finding that Wife was not negligent in failing to assert a claim to the HCHB interest in the parties' divorce proceeding. *See Rose*, 598 S.W.2d at 894; *see also Vickery*, 1997 WL 751995, at *24-25 (evidence sufficient to support finding that the wife was not negligent or at fault, in spite of some evidence showing that the wife was a legal assistant who should have understood the legal process and that the wife never called or wrote to

29

the attorney her husband hired for her).

Challenging this finding on appeal, Husband argues that the "undisputed facts" show Wife (1) signed a waiver of service in the divorce proceeding; (2) signed the agreed divorce decree; (3) signed a qualified domestic relations order; and (4) retained counsel during the pendency of the proceedings. Therefore, Husband argues, Wife was "consciously indifferent to protecting her rights."

But whether the petitioner's failure to raise a meritorious claim or defense was unmixed with any fault or negligence of her own is a question of fact. *See Alexander v. Hagedorn*, 226 S.W.2d 996, 998 (Tex. 1950). Husband's argument asks us to revisit the trial court's resolution of this question in light of the conflicting evidence presented at the hearing: the evidence showing Wife was mentally and emotionally distraught before, during, and after the divorce versus the evidence showing Wife participated in the divorce proceedings and retained counsel. We decline to second-guess the trial court's determination on this point. Because some evidence of substantive and probative character supports the trial court's determination that Wife was not negligent or at fault, we will not reverse that finding on appeal. *See Kukuk*, 2015 WL 4504224, at *1 (citing *Unifund CCR Partners*, 299 S.W.3d at 97).

Husband also argues that Wife's attorneys lacked diligence in pursuing her claim and points out that Wife's "Original Petition for Bill of Review" was filed approximately nine months after Wife signed a retainer contract with her current attorneys. But this alone does not render the trial court's finding an abuse of discretion. Testifying at the hearing, Wife said she did not have any documents or records pertaining to the HCHB interest when she first met with her attorneys in August 2016 — rather, Wife said she only had her divorce decree. Wife also said she wanted to ensure she was "on solid footing" before proceeding with the

petition for bill of review.

The trial court was permitted to consider this testimony in conjunction with the filings on record. *See Bob Smith Bail Bonds, Sur., v. State*, 963 S.W.2d 555, 556 (Tex. App.—Fort Worth 1998, no pet.) ("A trial court may take judicial notice of its own file at any stage of proceedings and is presumed to have done so with or without a request from a party."). Wife's original petition for bill of review included a detailed recitation of the facts underlying Wife's claim and the relevant legal authorities pertaining to a bill of review. The bill of review petition also included affidavits from Wife, two of Wife's friends, and Johnston. This filing, considered with Wife's testimony, supports the conclusion that Wife's attorneys were not negligent by waiting nine months to file Wife's petition and used that time to prepare for the filing. Accordingly, this evidence is sufficient to support the trial court's finding that Wife was not negligent or at fault.

We overrule Husband's challenge to this finding.

## D. Husband's Challenge Regarding Additional Findings of Fact

The trial court issued findings of fact and conclusions of law on January 27, 2020, after the trial on the parties' property division. The trial court's findings of fact state that Wife's petition for bill of review was granted; the findings do not address the specific elements necessary to bring a bill of review.

On February 12, 2020, the trial court issued "Additional or Amended Findings of Fact and Conclusions of Law (Second)." In relevant part, the trial court found that Wife (1) "established facts sufficient to constitute a meritorious defense to the original 2013 property division"; (2) "established that the original 2013 property division was rendered as a result of fraud of [Husband]"; and (3) "established that the fraud was unmixed with any fault or negligence of her

31

own."

Husband filed a "Request for Additional or Amended Findings of Fact and Conclusions of Law" and asserted as follows:

1.    While the court found that [Wife] had "established facts sufficient to constitute a meritorious defense," the Court did not find what those facts were, or what the meritorious defense was.

2.    While the court found that [Wife] "established that the original 2013 property division was rendered as the result of fraud, accident, or mistake of [Husband]" the court does not specify if it was fraud, accident or mistake.  Further, the court did not find what that fraud, accident, or mistake was, nor did the court find any facts supporting that conclusion.

3.    The court failed to find any facts supporting the conclusion that the "fraud, accident, or mistake was unmixed with any fault or negligence" of [Wife].

The trial court did not issue additional findings with respect to the bill of review elements.  On appeal, Husband contends that this failure to issue additional findings constitutes error.

A trial court is required to file findings of fact and conclusions of law within twenty days after a timely request is made.  Tex. R. Civ. P. 297.  Upon a party's timely request for additional findings, the trial court "shall file any additional or amended findings and conclusions that are appropriate."  Tex. R. Civ. P. 298.

The Fort Worth Court of Appeals has interpreted this rule to require additional findings and conclusions "only when they relate to ultimate or controlling issues."  *Kirby v. Chapman*, 917 S.W.2d 902, 909 (Tex. App.—Fort Worth 1996, no pet.).  "Additional findings are not required if the original findings of fact and conclusions of law 'properly and succinctly relate the ultimate findings of fact and law necessary to apprise [the party] of adequate information for the preparation of his or her appeal.'"  *Jamestown Partners, L.P. v. City of Fort Worth*,

83 S.W.3d 376, 386 (Tex. App.—Fort Worth 2002, pet. denied) (quoting *In re Marriage of Morris*, 12 S.W.3d 877, 886 (Tex. App.—Texarkana 2000, no pet.)). Additional findings and conclusions are not required "if they are evidentiary only." *Kirby*, 917 S.W.2d at 909.

If the refusal to file additional findings or conclusions does not prevent a party from adequately presenting an argument on appeal, there is no reversible error. *Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 612 (Tex. App.—Fort Worth 2006, pet. denied). To make this determination, we examine the record; if the record shows that a party did not suffer injury from the failure to make additional findings or conclusions, then no reversal is required. *Jamestown Partners, L.P.*, 83 S.W.3d at 386.

Here, we conclude Husband's requested additional findings were merely evidentiary and adequately covered by the findings issued by the trial court. The elements necessary to warrant a bill of review and those elements' application in the context of a divorce are well-established in the case law. As shown by the analyses above, the trial court's refusal to issue additional findings did not prevent Husband from adequately presenting his arguments on appeal with respect to these elements. *See Main Place Custom Homes, Inc.*, 192 S.W.3d at 612. Accordingly, we conclude Husband did not suffer any injury from the trial court's failure to issue additional findings.

We overrule Husband's challenge with respect to the trial court's refusal to issue additional findings with respect to the bill of review.

## II. Property Division

### A. Governing Law and Standard of Review

In dividing the parties' community estate, the trial court shall order a

33

division of the property that it deems just and right, having due regard for the rights of each party. Tex. Fam. Code Ann. § 7.001; *Boyd v. Boyd*, 131 S.W.3d 605, 610 (Tex. App.—Fort Worth 2004, no pet.). "The division of the community estate need not be equal, but it should be equitable." *Barnard v. Barnard*, 133 S.W.3d 782, 787 (Tex. App.—Fort Worth 2004, pet. denied). This standard vests the trial court with broad discretion in dividing the marital estate; accordingly, we will not disturb the trial court's division on appeal unless the complaining party shows that the division was so unjust and unfair as to constitute an abuse of discretion. *Murff v. Murff*, 615 S.W.2d 696, 698-99 (Tex. 1981); *Neyland v. Raymond*, 324 S.W.3d 646, 649 (Tex. App.—Fort Worth 2010, no pet.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles, that is, if its act is arbitrary or unreasonable. *Boyd*, 131 S.W.3d at 610.

In reviewing a marital property division, the abuse of discretion standard overlaps with the traditional civil sufficiency standards of review. *Chi Hua Lee v. Linh Hoang Lee*, No. 02-18-00006-CV, 2019 WL 3024478, at *2 (Tex. App.—Fort Worth July 11, 2019, no pet.) (mem. op.). Therefore, legal and factual sufficiency are not independent grounds of error but instead are relevant factors in assessing whether the trial court abused its discretion. *Id*. To determine whether an abuse of discretion has occurred because the evidence is legally or factually insufficient to support the trial court's decision, we engaged in a two-pronged inquiry: (1) whether the trial court had enough information upon which to exercise its discretion, and (2) whether the trial court erred in applying its discretion. *Id*. The applicable sufficiency review comes into play in answering the first question. *Id*. With respect to the second question, we determine whether the trial court's decision is reasonable based on the elicited evidence. *Id*.

## B.    Evidence Addressing the HCHB Interest

To analyze the parties' arguments addressing the trial court's property division, we focus on evidence addressing the characterization and value of the HCHB interest.

### 1.    Trial

The first witness at trial was April Anthony, the chief executive officer of HCHB, who testified via deposition. Anthony said HCHB started as a Kentucky LLC organized in 2001. According to Anthony, she became the "100 percent owner" of HCHB in March 2006.

Anthony testified that she hired Husband as vice president of implementation services in 2005. Admitted into evidence was Husband's offer letter from HCHB, which was dated August 20, 2005. According to the letter, Husband's compensation package consisted of three components: (1) an annual salary; (2) a "potential 25% annual performance bonus"; and (3) a "bonus on sale" of HCHB. The offer letter provided as follows with respect to the third compensation component:

**Bonus on Sale of Homecare Homebase – Offered to [Husband]**
**8/20/2005**

Introduction: Plan is meant to provide a bonus to key executives upon sale of the company, if employed by HCHB 30 days prior to the sale. Bonus payable will be calculated on the amount of sale less ten million dollars ($10,000,000). In other words, the bonus will be payable on the sale amount in excess of $10mm.

Bonus offered to [Husband] will be no less than $20,000, regardless of the date of sale after a minimum of 30 days employment. Percentage opportunity will escalate over time as follows:

| Sale Date | Bonus Payable |
|---|---|
| 11/1/2005-4/30/2006 | (Sale Price – 10,000,000) * .0025 |

| | |
|---|---|
| 5/1/2006-10/30/2006 | (Sale Price – 10,000,000) * .005 |
| 11/1/2006-4/30/2007 | (Sale Price – 10,000,000) * .0075 |
| On or after 5/1/2007 | (Sale Price – 10,000,000) * .01 |

Anthony described the bonus on sale as a "transaction based bonus that would occur upon there being an equity event for the company." Continuing on, Anthony said that "[w]hen an equity event for the company occurred, [Husband] would have the opportunity to be paid an amount commensurate with the equity value of the transaction." Anthony said the $10 million threshold for the transaction bonus's payment schedule represented the amount invested by HCHB's original equity holders.

Anthony testified that Husband "performed well, expanded his responsibility and eventually expanded into a much more expansive role." Based on this performance, Anthony said Husband's transaction bonus was increased to 4% "in relatively short order." According to Anthony, this increased transaction bonus was offered and accepted as part of a verbal agreement; Anthony said she was unable to find any documentation in writing to support the increased bonus.

According to Anthony, she "made the decision to stop these informal interests in [HCHB's] equity sale and go to a more formal relationship" and accordingly "remove[d] the transaction bonus and replace[d] it with a formal equity instrument." With respect to Husband, Anthony said he was granted a 3% equity interest in HCHB on January 1, 2007, as shown in the "First Amendment to Agreement of Limited Partnership of Home Care Home Base, L.P." Anthony testified that the applicable percentage was reduced to 3% "to reflect the fact that you no longer have this $10 million threshold." With respect to this exchange, Anthony testified as follows:

36

Question: When you offered [Husband] the 3 percent equity interest in HCHB, LP, he no longer had the option of a transaction bonus, correct?

Answer: Correct.

Question: And what — what I believe you said earlier is that at that point in time, his choice was: Accept the equity interest, stay, work with us, or you can leave?

Answer: Correct.

Question: And if he had left at the point that you and he had that conversation, he would not have had either a transaction bonus or an equity interest, correct?

Answer: Correct.

Further describing the differences between the original transaction bonus and the later-enacted equity interest, Anthony said the transaction bonus was a "nonequity interest" that "never came into effect" because the triggering sale to a third-party for greater than $10 million did not occur. Anthony also noted that the equity interest inured its owners with additional rights that the transaction bonus did not confer, such as the right to engage in partial sales. Payments made as part of the transaction bonus would also "be taxed as ordinary income at a higher tax rate", making the equity interest "a much more effective tax instrument".

Anthony testified that 40% of HCHB was purchased in 2011 by two private equity companies for a total of $56,550,000. From this sale, Husband received approximately $1,612,500 and his HCHB interest decreased from 3% to 1.8%.

Anthony said the company underwent "an extraordinary amount of growth" and, in summer 2013, the executives prepared to take it to market. On December 19, 2013, Hearst purchased 85% of HCHB for approximately $625 million. From this sale Husband received approximately $6,669,544.

In January 2018, Hearst purchased 30% of the rollover equity from the

37

December 2013 transaction, from which Husband received approximately $1,923,942. Hearst purchased the remaining HCHB shares in May 2019, from which Husband received approximately $5,771,833.

Husband also testified with respect to his compensation package and equity interest in HCHB. Husband said he initially was hired as HCHB's vice president of implementation services and began work on September 6, 2005. According to Husband, he was promoted to chief operating officer in March 2006 and Anthony increased his transaction bonus to 4%. Like Anthony, Husband said this increased bonus amount was not recorded in writing. Husband said he received a 3% equity interest in HCHB in January 1, 2007, as reflected in the first amendment to HCHB's limited partnership agreement.

Husband said his and Wife's divorce was finalized on October 7, 2013, with the signing of their agreed divorce decree. Reviewing the divorce decree, Husband agreed that it "pretty basically reflect[ed] a 50-50 division of the bank accounts [and] the retirement plan" he had with HCHB. From their six bank accounts, Husband and Wife each received approximately $500,000. Husband said he also gave Wife a $12,000 credit for the furniture he kept. Admitted into evidence was a statement from Husband's bank account showing these withdrawals were made when Husband paid the money to Wife.

Husband called Michael McDonald, an employment law attorney, as an expert witness with respect to the characterization of the HCHB interest. McDonald recounted the same timeline of events discussed in Anthony's testimony: Husband was hired in 2005 and his compensation package included a transaction bonus ranging from .25% to 1%; Husband's transaction bonus was increased to 4% in 2006; and Husband received an equity interest in HCHB in January 2007.

38

According to McDonald, Anthony "exchanged" Husband's 4% transaction bonus for the 3% equity interest in HCHB. McDonald acknowledged that there were not any sales triggering the transaction bonus but asserted that Husband's "rights" under the transaction did not "disappear". McDonald opined that "the fact that these rights [under the transaction bonus] were never asserted doesn't eliminate their existence"; rather, the equity interest "replac[ed] one set of rights with a new set of rights."

Wife called Bryan Rice, a certified public account, to testify with respect to the characterization and value of the HCHB interest. Rice opined that the HCHB interest was community property as of the date of the parties' divorce. With respect to valuation, Rice testified that he believed "the value [of the HCHB interest] could be as high as about $14.4 million, which is essentially what [Husband] received subsequent to the date of his divorce for his remaining interest."

According to Rice, rights to an equity partnership interest arise when the "equity interest is vested in the party who owns it" and "there's nothing else that has to happen for [the owner] to be able to exercise those rights." Rice opined that the HCHB equity interest arose with the execution of the first amendment to HCHB's limited partnership agreement in January 2007, which granted Husband a 3% equity interest in the company. Noting that Husband and Wife were married in 2006, Rice testified that he was "very" confident that Husband "first acquired his ownership interest in HCHB, LP during his marriage" to Wife.

Rice then testified regarding the value of the HCHB interest as of the parties' divorce on October 7, 2013. Rice said he relied on a letter HCHB received from Hearst on October 3, 2013, in which Hearst offered to pay between $550 million and $600 million to purchase HCHB.

Rice then reviewed a document setting forth the various sales of the HCHB interest from March 2011 through May 2019. In relevant part, the document shows:

| Date | Sold To | % Sold | % Remaining | Enterprise Value | $ to [Husband] |
|---|---|---|---|---|---|
| 3.1.11 | Cressey & Co. + SV Life Sciences | 19.5% 19.5% | 1.8% | $145 Million | $1,612,500.00 |
| 12.19.13 | Hearst Corp. | 85% | .027% | $625 Million | $6,669,544.00 |
| 1.3.18 | Hearst Corp. | 30% | .0189% | $1.4 Billion | $1,923,942.72 |
| 5.29.19 | Hearst Corp. | Final Sale | | $1.8 Billion | $5,771,833.92 |

**TOTAL PROCEEDS TO [HUSBAND] – $15,977,821.13**

Describing the HCHB interest as a "true minority interest", Rice opined that it would be "equitable to divide . . . that type of percentage interest in kind because that simply keeps both of the parties that own the property in the same position they were before the interest was divided." Rice said, had he been testifying at the time of the parties' 2013 divorce, he would have recommended the HCHB interest be divided in kind.

Based on the October 2013 Hearst offer letter, Rice said he valued Husband's total 1.8% HCHB interest as of the October 7, 2013 divorce date at $7,881,816, with half of that amount equaling $3,940,908. Rice also noted that the .027% equity interest Husband retained after the December 2013 Hearst sale continued to yield large partnership distributions as well as proceeds from later equity sales.

On cross-examination, Rice testified that the $7,881,816 figure he used to value the HCHB interest as of the parties' divorce date would have been subject to

a capital gains tax of approximately 20%. Rice agreed that $6,305,453 would remain after deducting 20% from the $7.8 million figure.

## 2.    *The Trial Court's Final Judgment*

The trial court signed its final judgment on December 18, 2019. The trial court's property division was substantially the same as the division in the parties' 2013 agreed divorce decree:   (1) each party kept the household furniture, furnishings, fixtures, goods, appliances, equipment, clothing, jewelry, and other personal effects in their possession or subject to their sole control; (2) each party received half of the proceeds in the six bank accounts; (3) each party received half the proceeds from the sale of the marital home; (4) each party received half the proceeds in Husband's 401(k) plan with HCHB; (5) each party kept their vehicles; and (6) Husband retained the membership in the Trophy Club Country Club.

With respect to Husband's HCHB interest, the trial court held:

> With respect to the 1.8 percent of HomeCare HomeBase ("HCHB"), the remaining portions of which are represented by monies held by [Husband] in the "enjoined account,"[3] the Court awards to [Wife], from those proceeds, the sum of **$3,152,726.50**, plus prejudgment interest on that amount calculated at the rate of 5 percent, per annum, simple interest, beginning October 7, 2013, and plus post-judgment interest on that amount calculated at the rate of 5 percent, per annum, simple interest, beginning on the date of the signing of this *Final Judgment in Bill of Review Proceeding*, all to be paid from the "enjoined account."

---

[3] The "enjoined account" contains the proceeds Husband received from the 2019 sale of the remaining HCHB interest. Pursuant to two orders signed on May 30, 2019 and July 26, 2019, the trial court enjoined Husband from disbursing any funds from this account until Husband paid Wife her portion of the HCHB interest.

## C. Husband's Issues

### 1. *Characterization of the HCHB Interest*

In his first challenge to the trial court's property division, Husband argues the trial court erred by classifying the HCHB interest as community property subject to division. Specifically, Husband contends that the original transaction bonus he was promised at the beginning of his HCHB employment constituted separate property that was later "exchanged" for the 3% HCHB equity interest. Therefore, Husband argues, the HCHB equity interest retained its character as separate property.

Only community property is subject to the trial court's just and right division. *Barnard*, 133 S.W.3d at 789. Under Texas law, property possessed by either spouse during or on dissolution of the marriage is presumed to be community property, absent clear and convincing evidence to the contrary. Tex. Fam. Code Ann. § 3.003. Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id*. § 101.007. This intermediate standard of proof falls between the preponderance standard of proof that applies to most civil proceedings and the reasonable-doubt standard that applies to most criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re D.T.*, 34 S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied). "Clear and convincing evidence must outweigh evidence that would satisfy the preponderance standard, but it need not be unequivocal or undisputed." *Chi Hua Lee*, 2019 WL 3024478, at *4.

The characterization of property as either community or separate is determined by the inception of title to the property. *Boyd*, 131 S.W.3d at 612. Inception of title occurs when a party first has a right of claim to the property by

virtue of which title is finally vested. *Id*.

In order to overcome the community presumption, the burden is on the spouse claiming certain property as separate to trace and clearly identify the property claimed to be separate. *Id*. "The burden of tracing is a difficult, but not impossible, burden to sustain." *Chi Hua Lee*, 2019 WL 3024478, at *4. Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. *Boyd*, 131 S.W.3d at 612. Separate property will retain its character through a series of exchanges so long as the party asserting separate ownership can overcome the presumption of community property by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Id*.

Citing these principles, Husband contends that the original transaction bonus he was promised at the beginning of his HCHB employment constituted separate property that was later exchanged for the 3% HCHB equity interest. Therefore, Husband argues, the HCHB equity interest retained its character as separate property. We reject Husband's contention and conclude the trial court did not err by classifying the HCHB interest as community property subject to division.

The premise underlying Husband's argument on this point is correct: separate property retains its character through a series of exchanges. *See id*.; *see also Newland v. Newland*, 529 S.W.2d 105, 107 (Tex. App.—Fort Worth 1975, writ dism'd) ("property purchased with separate funds, or taken in exchange for separate property, becomes the separate property of him whose money purchases or whose property is given in exchange"). But this precept refers only to exchanges of ***property***; here, Husband's interest with respect to the transaction bonus originally included as a component of his HCHB compensation did not meet

this standard.

Husband did not have any defined, vested interest in the transaction bonus — rather, as supported by Anthony's testimony and Husband's 2005 offer letter from HCHB, the transaction bonus was contingent upon there being a qualifying equity event. But this contingency did not take place. As Anthony testified, the transaction bonus "never came into effect" because the triggering sale to a third-party for greater than $10 million did not occur before the transaction bonus was replaced with a formal equity interest. *See Raulston v. Raulston*, 531 S.W.2d 683, 685 (Tex. App.—Texarkana 1975, no writ) ("It is settled, however, that a . . . possibility of acquiring a title in the future is not such a legal expectancy as will amount to a present right or title in property.").

Moreover, Anthony testified that the transaction bonus was extinguished when formal equity interests in HCHB were established via the first amendment to HCHB's limited partnership agreement. According to Anthony, if Husband had declined the offered HCHB equity interest and instead chose to leave the company, he would not have been entitled to enforce any rights associated with the transaction bonus.

Aligned with Anthony's testimony on this issue, Rice testified that Husband's equity interest in HCHB vested when the first amendment to the HCHB limited partnership agreement was executed and Husband was formally granted a 3% equity interest. At this time, Rice testified, Husband was able to exercise those rights associated with the interest, thus demonstrating ownership of the asset. Because the first amendment to the HCHB limited partnership agreement was executed after Husband and Wife were married, Rice opined that he was "very" confident that Husband "first acquired his ownership interest in HCHB, LP during his marriage" to Wife.

44

To overcome the community presumption, the burden was on Husband to prove by clear and convincing evidence that the HCHB interest constituted his separate property.  *See* Tex. Fam. Code Ann. § 3.003; *Boyd*, 131 S.W.3d at 612. Based on the evidence discussed above, the trial court did not err in concluding that Husband failed to make this showing.

We overrule Husband's challenge to the trial court's characterization of the HCHB interest as community property subject to division.

### 2.  *Division of the HCHB Interest*

In his second challenge to the trial court's property division, Husband asserts the trial court's division of the HCHB interest was "arbitrary and against any guiding principles."  In support, Husband argues that "none of the numbers posited as the value of the HCHB asset represent a figure equal to double the award."

We reject this contention.  As we noted above, the trial court has broad discretion in dividing the marital estate and we do not disturb that division unless the complaining party shows the overall division was so unjust and unfair as to constitute an abuse of discretion.  *See Murff*, 615 S.W.2d 698-99; *Neyland*, 324 S.W.3d at 649.  Here, the evidence supports the trial court's decision to award Wife $3,152,726.50 as her portion of the HCHB interest.

Testifying at trial, Rice said he valued the HCHB interest as of October 7, 2013, the day the parties signed the agreed divorce decree.  In making this valuation, Rice consulted the October 3, 2013 letter from Hearst offering to purchase HCHB for between $550 million and $600 million.  At this time, Husband owned a 1.8% equity interest in HCHB.  After the December 19, 2013 sale of 85% of HCHB to Hearst, Husband received $6,669,544 and retained a .027% interest in the company.  Extrapolating these figures to calculate the value

45

of Husband's full 1.8% interest at the time of the December 2013 sale, Rice valued the asset at $7,881,816. Rice agreed that this figure would have been subject to a capital gains tax of approximately 20%, which would have left $6,305,453.

This $6,305,453 figure, divided in half, equals $3,152,726.50, which is what the trial court awarded to Wife for her share of the HCHB interest. This division of the asset comports with the trial court's other allocations of the parties' community property, which also were divided approximately in half. Therefore, based on the evidence presented at trial, the trial court's division of the HCHB interest does not constitute an abuse of discretion.

We overrule Husband's challenge to the trial court's division of the HCHB interest.

### 3. The Trial Court's Findings of Fact

In his final issue addressing the trial court's property division, Husband argues the trial court erred by failing to issue a finding addressing how the HCHB interest was valued as of October 7, 2013. Without this information, Husband argues, "[i]t is impossible to know, and properly present an appeal on the issue of, the ultimate fact of how the [HCHB interest] was valued".

As stated above, the trial court's December 18, 2019 final judgment awards Wife $3,152,726.50 as her portion of the HCHB asset, plus pre- and post-judgment interest. Within 20 days after the trial court signed the final judgment, Husband requested findings of fact and conclusions of law in accordance with Texas Rules of Civil Procedure 296 and 297. *See* Tex. R. Civ. P. 296, 297. The trial court issued findings of fact and conclusions of law on January 29, 2020. The trial court made the following finding with respect to the HCHB interest:

> With respect to the 1.8 percent of HCHB, the remaining portions of which are represented by the monies of which are held by [Husband]

46

in the "enjoined account," the Court awarded to [Wife], from those proceeds, the sum of $3,152,726.50, plus prejudgment interest on that amount calculated at the rate of 5 percent, per annum, simple interest, beginning October 7, 2013, all to be paid from said account.

In his first "Request for Additional and Amended Findings of Fact and Conclusions of Law", Husband cited Texas Rule of Civil Procedure 298 and requested the trial court make a finding as to "[t]he value of the 1.8 percent of HCHB subject to division as of October 7, 2013". Denying this request, the trial court held that the requested finding lacked the specificity required by Texas Rule of Civil Procedure 298 and was untimely pursuant to Texas Family Code section 6.711.

Section 6.711(a) of the Family Code provides that, in a suit for dissolution of marriage, on the request of a party the court shall state in writing its findings of fact and conclusions of law regarding (1) the characterization of each party's assets, liabilities, claims, and offsets on which disputed evidence has been presented, and (2) the value or amount of the community estate's assets, liabilities, claims, and offsets on which disputed evidence has been presented. Tex. Fam. Code Ann. § 6.711(a). However, as the Fort Worth Court of Appeals has held, a party must specifically request findings under section 6.711(a) to preserve for appeal any error associated with the trial court's failure to make findings regarding the valuation of certain assets. *See Logsdon v. Logsdon*, No. 02-14-00045-CV, 2015 WL 7690034, at *10 (Tex. App.—Fort Worth Nov. 25, 2015, no pet.) (mem. op.) ("Because Wife initially requested findings under rule 296, did not request findings under section 6.711, and requested additional findings under family code section 7.009, we hold that Wife waived her right to section 6.711 findings."); *see also Moore v. Moore*, 383 S.W.3d 190, 200-01 (Tex. App.—Dallas 2012, pet. denied) (holding that initial request for findings of fact pursuant to Rule 296

47

waived right to section 6.711 findings requested after the expiration of time for initial request for fact findings).

Here, neither Husband's original request for findings of fact and conclusions or law nor his request for additional findings referenced Texas Family Code section 6.711(a). Based on the authorities discussed above, we conclude Husband waived his right to findings under section 6.711 regarding the valuation of certain assets. *See Logsdon*, 2015 WL 7690034, at *10; *Moore*, 383 S.W.3d at 200-01.

We overrule Husband's challenge with respect to the trial court's refusal to issue additional findings with respect to its division of the HCHB interest.

### D.    Wife's Issue

In her sole issue challenging the trial court's property division, Wife asserts the trial court "incorrectly valued the HCHB interest by refusing to partition in kind in accordance with Texas law." This erroneous valuation, Wife argues, grants Husband a "windfall" by failing to take into account the full $14 million in proceeds Husband received from subsequent partial sales of the HCHB interest.

Assets may be partitioned in kind (meaning that property is divided into separate parcels and each parcel is allocated to a separate owner) or by sale (meaning that property is sold and sale proceeds are divided among the owners). *Carter v. Harvey*, 525 S.W.3d 420, 429 (Tex. App.—Fort Worth 2017, no pet.). Texas law favors partition in kind over partition by sale. *Id.* "The threshold question in a partition suit is whether the property is 'susceptible of partition' in kind or if it is, instead, 'incapable of partition' in kind because a 'fair and equitable division' cannot be made." *Bowman v. Stephens*, 569 S.W.3d 210, 220 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (quoting Tex. R. Civ. P. 761, 770).

Here, Wife did not cite (and our research did not find) any cases or other

authority supporting a partition in kind where an asset has already been divested in favor of monetary proceeds. Rather, the cases Wife cites discuss a partition in kind with respect to assets that are still intact. *See Tarver v. Tarver*, 394 S.W.2d 780, 781 (Tex. 1965) (discussing partition in kind with respect to oil royalties, stocks, and bonds); *Hailey v. Hailey*, 331 S.W.2d 299, 301-03 (Tex. 1960) (discussing partition in kind with respect to real property owned by the parties); *Nelson v. Nelson*, 193 S.W.3d 624, 629-30 (Tex. App.—Eastland 2006, no pet.) (discussing partition in kind with respect to a 12-acre tract); *Walston v. Walston*, 971 S.W.2d 687, 692-93 (Tex. App.—Waco 1998, pet. denied) (discussing partition in kind in the context of the parties' personal property, including furniture, appliances, and tools); and *Braswell v. Braswell*, 476 S.W.2d 444, 445 (Tex. App.—Waco 1972, writ dism'd) (discussing partition in kind with respect to stock in a closely-held corporation). These authorities do not support the conclusion that the trial court erred by failing to partition in kind an interest that no longer exists in its original form.

Therefore, we construe Wife's issue as a challenge to the trial court's valuation and division of the HCHB interest. As discussed above, the evidence shows the trial court's allocation of this asset does not constitute an abuse of discretion.

We overrule Wife's challenge to the trial court's property division.

## III.  Attorney's Fees

In its final judgment, the trial court included the following provision awarding attorney's fees:

> The Court awards a judgment in favor of [Wife] against [Husband] in the amount of **$100,000.00** for reasonable and necessary attorney's fees, plus post-judgment interest on that amount calculated at the rate

49

of 5 percent, per annum, simple interest, beginning on the date of the signing of this *Final Judgment in Bill of Review Proceeding*, all to be paid from the "enjoined account."

Challenging this award, Husband asserts (1) the evidence is legally and factually insufficient to support the award of attorney's fees, and (2) the trial court failed to issue the requisite findings of fact and conclusions of law. Turning to Wife's challenge, she contends that, because the award only represented 10% of her total fees incurred in the underlying proceedings, it was neither just nor right.

We begin with Husband's arguments.

## A.    Husband's Issues

Husband's first argument challenges the legal and factual sufficiency of the evidence underlying the trial court's attorney's fees award. We conclude the award is supported by sufficient evidence.

Here, at least two legal bases support the trial court's attorney's fees award. First, the trial court had equitable power to award either spouse attorney's fees as part of its just and right division of the marital estate. *See* Tex. Fam. Code Ann. § 7.001; *Mandell v. Mandell*, 310 S.W.3d 531, 541 (Tex. App.—Fort Worth 2010, pet. denied); *see also Bowen v. Bowen*, No. 02-10-00297-CV, 2011 WL 3426233, at *12 (Tex. App.—Fort Worth Aug. 4, 2011, pet. denied) (mem. op.) ("Because the award of attorney's fees in a divorce case can be part of the property division, the trial court can award them to either party, regardless of who is successful in the trial court or on appeal."). Second, the trial court also had power to award Wife fees in the bill of review proceeding because there was a legal basis for awarding them in the underlying cause of action, *i.e.*, the divorce. *See, e.g., Dias*, 2014 WL 6679525, at *9-10.

Wife's attorney testified and offered evidence addressing the fees incurred in

both the bill of review proceeding and at trial.  For the bill of review, the attorney said Wife incurred $386,768.33 in fees and expenses.  For the subsequent trial, the attorney said Wife incurred $563,950.95 in fees and expenses.  To support these amounts, Wife's attorney also offered into evidence two affidavits and over 150 pages of billing records.  These billing records include (1) a description of each task performed in the matters; (2) the person performing the work; (3) the date the work was performed; (4) the amount of time required; and (5) the charges incurred.  This evidence is legally and factually sufficient to support the trial court's $100,000 attorney's fee award.  *See Finley v. Finley*, No. 02-11-00045-CV, 2015 WL 294012, at *7 (Tex. App.—Fort Worth Jan. 22, 2015, no pet.) (mem. op.) ("To support a request for reasonable attorney's fees, testimony should be given regarding the hours spent on the case, the nature of preparation, the complexity of the case, the experience of the attorney, and the prevailing hourly rate.").

In his second argument, Husband asserts the trial court erred by refusing to issue findings of fact addressing the authority under which the trial court awarded fees.  We disagree.

As we discussed above, there is no reversible error if the refusal to file additional findings or conclusions does not prevent a party from adequately presenting an argument on appeal.  *See Main Place Custom Homes, Inc.*, 192 S.W.3d at 612; *Jamestown Partners, L.P.*, 83 S.W.3d at 386.  Here, the trial court had two bases for awarding attorney's fees and Wife's attorney presented evidence sufficient to support a $100,000 fee award pursuant to either standard.  Husband did not raise any specific challenges with respect to this evidence.

Rather, Husband contends that, because the trial court divided the parties' estate as of October 7, 2013, the trial court was limited to an award of fees incurred as of this date.  Husband does not cite any case law or other authority to support

51

that contention and we decline to impose that limitation here.

We overrule Husband's challenges to the trial court's attorney's fees award.

## B.     Wife's Issue

In her cross appeal, Wife contends that the "trial court's award of only 10% of the attorney's fees Wife incurred in unveiling Husband's fraud was neither just nor right." Wife asks that we reverse the fees award and "instruct the trial court to instead award Wife judgment for 100% of her proven reasonable and necessary attorney's fees and costs."

As stated above, the trial court here could award attorney's fees as part of its division of the parties' estate or following the bill of review proceeding because the underlying action (the parties' divorce) permitted a fee award. *See Dias*, 2014 WL 6679525, at *9-10; *Mandell*, 310 S.W.3d at 541. An award of attorney's fees in a divorce proceeding is committed to the trial court's "sound discretion" and is "but another element for the court to consider in dividing the marital estate." *Mandell*, 310 S.W.3d at 541; *see also In re Marriage of C.A.S. and D.P.S.*, 405 S.W.3d 373, 386 (Tex. App.—Dallas 2013, no pet.) ("as in its decision to award fees as part of the division [of the marital estate], the trial court has broad discretion in determining the amount"). To warrant reversal, parties challenging the valuation of a particular asset allocated in a divorce proceeding must contend that the erroneous valuation caused the court to abuse its discretion in its overall division of the community estate. *See Ball v. Roney*, No. 2-08-213-CV, 2008 WL 4831412, at *2 (Tex. App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.).

Here, Wife's challenge to the trial court's attorney's fees award addressed only the fee award itself — Wife did not demonstrate how the trial court's allocation of this asset rendered its overall division an abuse of discretion.

Accordingly, even if the trial court erred in its valuation of Wife's attorney's fees, Wife did not show that such error would require reversal of the trial court's judgment dividing the parties' estate. *See, e.g., Lynch v. Lynch*, 540 S.W.3d 107, 132 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Kemp v. Kemp*, No. 11-11-00292-CV, 2013 WL 5891583, at *6 (Tex. App.—Eastland Oct. 31, 2013, no pet.) (mem. op.).

We overrule Wife's challenge to the trial court's attorney's fees award.

## CONCLUSION

We affirm the trial court's December 18, 2019 final judgment.


/s/     Meagan Hassan
        Justice


Panel consists of Chief Justice Christopher and Justices Hassan and Poissant.